Daniel WALZ, by his Guardian
Ad Litem Dana P. WALZ,
Plaintiff,

v.

EGG HARBOR TOWNSHIP BOARD
OF EDUCATION, et al.,
Defendants.

No. CIV.00–2149(JBS).

United States District Court,
D. New Jersey.

Feb. 11, 2002.

Michael P. Laffey, Cassidy Messina & Laffey, Holmdel, NJ, for Plaintiff.

Joseph F. Betley, Armando V. Riccio, Capehart & Scatchard, P.A., Mount Laurel, NJ, for Defendants.

**OPINION**

SIMANDLE, District Judge.

This claim for injunctive and declaratory relief arising from the alleged infringement of plaintiff's First and Fourteenth Amendment rights, contrary to 42 U.S.C. § 1983, comes before the Court on the motion for summary judgment by plaintiff Daniel Walz ("Daniel") and the cross-motion for summary judgment by defendants the Egg Harbor Township Board of Education ("Egg Harbor BOE") and Leonard Kelpsh ("Dr.Kelpsh") in his official capacity as Superintendent of Egg Harbor Township Schools (or, collectively, "defendants"), pursuant to Rule 56, Fed.R.Civ.P. Plaintiff seeks summary judgment on his Complaint, a declaration that defendants' policy of prohibiting the distribution of religious gifts in the classroom is unconstitutional, and an injunction prohibiting defendants from enforcing this policy. Defendants argue that the restrictions placed on Daniel were viewpoint neutral and reasonably related to the school's pedagogical purpose. Defendants further note that reasonable accommodations were made for the distribution of plaintiff's religious material. For the following reasons, defendants' motion for summary judgment will be granted, and plaintiff Daniel Walz's Complaint will be dismissed.

## I. *BACKGROUND*

The facts of this case involving proselytizing pencils, evangelical candy canes, and very young school children are largely undisputed. Plaintiff Daniel Walz, now nine years of age, was born on September 25, 1992 and has attended public school in Egg Harbor Township since 1998. On three occasions, discussed in detail below, plaintiff was not allowed to distribute items with a religious message in class or during school-sponsored and supervised holiday

parties. These three incidents are the basis of plaintiff's Complaint, which alleges violations of plaintiff's First Amendment free speech and free exercise rights, Fourteenth Amendment equal protection rights, 42 U.S.C. § 1983, and the New Jersey Law Against Discrimination ("NJLAD").

The first alleged incident occurred in the spring of 1998, when plaintiff was in developmental kindergarten ("pre-K") and attended an in-class, school-sponsored holiday party. During the party, the then four and one-half year-old plaintiff Daniel distributed pencils with the imprinted message "Jesus ♥ the Little Children" to the other children in his pre-K class. (See Laffey Cert., Ex. C, Picture of the "proselytizing pencils.") Plaintiff's mother, Dana Walz, who was present at the party as a chaperone, selected and purchased the pencils for plaintiff to distribute at school because of their religious message.[1] Plaintiff's then teacher, Joan Safaryn, collected the pencils and contacted several school officials, including the school's superintendent, defendant Dr. Kelpsh, in order to determine whether the pencils should be distributed at the in-class party. Dr. Kelpsh determined that the pencils should not be distributed at the in-class, school-sponsored holiday party because the young children and their parents might be confused as to the school's endorsement of the religious message. After this incident, Mrs. Walz inquired as to whether the school had a written policy regarding freedom of religious expression in school and was informed that there was no such policy. Mrs. Walz provided the school with some information that she believed would aid in the implementation of such a policy.

On October 13, 1998, the Egg Harbor BOE adopted a written policy regarding the recognition of religion in its schools. That policy, in part, provides that "no religious belief or nonbelief shall be promoted in the regular curriculum or in district-sponsored courses, programs or activities, and none shall be disparaged." (Laffey Cert., Ex. D.) The policy, however, recognizes that a broad secular education can be furthered by exposing pupils to various cultural and religious societies, and provides that religion may be acknowledged in the course of teaching and school activities "if presented in an objective manner and as a traditional part of the culture and religious heritage of the particular holiday." Id. Mrs. Walz believed that the adopted policy, which does not specifically address the dissemination of religious materials, would allow her son, the plaintiff, to hand out gifts with religious messages in school. (See Walz Cert., ¶ 7.)

The second alleged incident occurred in December, 1998, when plaintiff was in kindergarten and attended an in-class, school sponsored winter holiday party. During the winter party, the then five year-old plaintiff distributed candy canes with an attached religious story, entitled "A Candy Maker's Witness."[2] Mrs. Walz first read the evangelical story when her daughter brought home a copy from a local event.

---

**1.** The facts leave little doubt that plaintiff's mother, Dana Walz, is the driving force behind the distribution of these items and this lawsuit. It is highly unlikely that plaintiff, who was only 4½ at the time he attempted to distribute the pencils, was able to independently read and advocate the dissemination of the message on the pencils. Additionally, Mrs. Walz has consistently inquired about and challenged the school's limitations on the distribution of such items and she is the one who is dissatisfied with the accommodations made by the school. The Court will, however, for the purposes of these summary judgment motions, assume that plaintiff, now nine, was attempting to freely speak and exercise his religious beliefs when distributing these items to his young classmates.

**2.** The story attached to the candy plaintiff attempted to distribute is as follows:

A candymaker in Indiana wanted to make a candy that would be a witness, so he

Mrs. Walz entered the story on her home computer and made duplicate copies, which she then attached to the candy canes plaintiff attempted to distribute at the winter party. Mrs. Walz chose to attach the story because it was symbolic of the Christian holiday and because of the religious significance it projected onto the candy canes. When Mrs. Walz contacted the school regarding plaintiff's ability to distribute the candy canes, she was told that plaintiff would not be permitted to distribute the canes and evangelical message in class, but that he would be permitted to distribute the items before school, during recess, or after school. Plaintiff was also permitted to distribute the candy canes in the hallway after school.

The third alleged incident occurred in December, 1999, when plaintiff was in first grade and attended an in-class, school sponsored winter holiday party.[3] After his mother contacted the school and was again informed that the then six year-old plaintiff would only be permitted to distribute the proselytizing candy canes before school, during recess, or after school, and not during the in-class, school-sponsored event, plaintiff distributed the canes in the school hallway after class. Mrs. Walz acknowledged that the other items distributed at the December, 1999 party were generic in nature. (Walz Dep., Tr. 75.) Mrs. Walz also concedes that plaintiff is still allowed to distribute items with religious significance outside of school hours and outside the classroom. (*Id.* at 113.)

The defendants' general policy regarding gift-giving of any kind at plaintiff's

---

made the Christmas candy cane. He incorporated several symbols for the birth, ministry, and death of Jesus Christ.

He began with a stick of pure white, hard candy. White to symbolize the Virgin Birth and the sinless nature of Jesus, and hard to symbolize the Solid Rock, the foundation of the Church, and the firmness of the promises of God.

The candymaker made the candy in the form of a "J" to represent the precious name of Jesus, who came to earth as our Savior. It could also represent the staff of the "Good Shepherd" with which He reaches down into the ditches of the world to lift out the fallen lambs who, like all sheep, have gone astray.

Thinking that the candy cane was somewhat plain, the candymaker stained it with red stripes. He used three small stripes to show the stripes of the scouring Jesus received by which we are healed. The large red stripe was for the blood shed by Christ on the cross so that we could have the promise of eternal life.

Unfortunately, the candy became known as a candy cane, a meaningless decoration seen at Christmas time. But the meaning is still there for those who "have eyes to see and ears to hear." I pray that this symbol will again be used to witness The Wonder of Jesus and His Great Love that came down at Christmas and remains the ultimate and dominant force in the universe today.

(*See* Laffey Cert., Ex. E.)

This is one of several purported origins for the candy cane. Although the truth of the message a plaintiff seeks to disseminate is not determinative of the issue at hand, it is interesting to consider some of the other purported origins of the candy cane. Some brief research revealed that candy canes were first seen in or around 1670 in Cologne, Germany, approximately 130 years before Indiana was organized as a territory and 146 years before it became a state in 1816. The canes were white and used to reward children who were well behaved while in church. Most depictions of such canes on Christmas cards prior to 1900 reveal that the red stripes were not added until the twentieth century. The canes have primarily been associated with the Christmas holiday in one form or another, but their actual religious symbolism, if any, is unclear.

3. Prior to this party, a memorandum from two teacher coordinators was distributed which gave guidelines about the "dos and don'ts" for the Winter Holiday Party. The memo instructed that the parties should be as generic as possible, emphasizing the whole season. (Defs.' Ex. C.)

school is that any gifts should be donated to the local Parent Teacher Organization ("PTO"), which would then distribute the trinkets to the class at the seasonal event. Direct gifts from students are discouraged because of the potential economic strain on certain students and the potential emotional distress if a particular student were to be excluded from the direct gift-giving. (Pl.'s Ex. F., Kelpsh Dep., Tr. 59:14–22.) This policy is not written, but rather orally communicated from the principal to teachers, who disseminate the information to other teachers, parents, and students through holiday letters and memoranda. (Kelpsh Dep., Tr. 59:7–60:24.) Items with corporate names or references to political candidates or unions are not allowed to be distributed in any class during school hours. (Def.'s Ex. D, Kelpsh Dep., Tr. 62:5–64:24.) Plaintiff's teacher, who confiscated the proselytizing pencils in 1998, said she would have done the same thing if the pencils had contained a political or commercial message, such as "Vote for Joe Smith" or "Home Depot." (Def.'s Ex. E, Safaryn Dep., Tr. 16:2–19:19.) Mrs. Walz asserted that she witnessed other children directly handing out gifts, some wrapped, at holiday parties, which contained generic pencils and candy. (*See* Walz Cert., ¶ 12; Def.'s Ex. A, D. Walz Dep., Tr. 74:9–75:21.) Mrs. Walz claimed that her son's religious gifts were the only ones not permitted to be directly distributed from a student to the class, but offered no specific instances where other children were allowed to directly distribute gifts and no evidence of such conduct. (*See* Walz Cert., ¶ 12.) Mrs. Walz identified no instance in which another child distributed a non-generic gift with any sort of message during class time.

Dr. Kelpsh elaborated on the intent behind the limited gift distribution policy by stating that it was to ensure that no confusion about the origin of any distributed gifts with corporate, political, or religious messages, and also that the BOE did not want anyone to mistakenly believe that the school was endorsing any particular message. (Kelpsh Dep., Tr. 74–77; Walz Dep., Tr. 60:5–17.) School classes and events under the authority of the Egg Harbor BOE are closely controlled and monitored by the principal and teachers. Additionally, teachers and occasionally parents, including at times Mrs. Walz, were present at each of the school-sponsored parties at issue. There is no allegation that the defendants treated one religion more favorably than plaintiff's Christianity; rather, plaintiff asserts that other generic gifts without messages were allowed, when plaintiff's proselytizing pencils and evangelical candy canes were not.

On May 2, 2000, plaintiff, through his mother and Guardian Ad Litem Dana P. Walz, filed a Complaint in this Court, alleging that the defendants violated his First Amendment free exercise and freedom of expression rights (*see* Compl., ¶¶ IV–V), his Equal Protection rights under the Fourteenth Amendment (*see* Compl., ¶¶ VI–VII), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et. seq.* ("NJLAD")(*see* Compl., ¶ VIII). On July 6, 2001, both plaintiff and defendants cross-moved for summary judgment. For the reasons stated herein, the Court finds that no material facts are in dispute and that the defendants are entitled to judgment as a matter of law that they have not violated plaintiff's rights. Defendants' motion will be granted and plaintiff's motion and complaint will be dismissed.

## II. *DISCUSSION*

Defendants and plaintiff Daniel cross-move for summary judgment in this action under Rule 56, Fed.R.Civ.P. Plaintiff argues that defendants violated 42 U.S.C.

§ 1983 when they allegedly curtailed plaintiff's freedom of speech and free exercise First Amendment rights and violated the Equal Protection clause of the Fourteenth Amendment, and also that defendants' conduct violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* ("NJLAD"). Plaintiff seeks a declaration that the school's policy is unconstitutional and an injunction prohibiting the future enforcement of the policy. Defendants argue that the pre-K, kindergarten, and first grade classrooms are non-public forums and that the limitations placed on plaintiff's in-class activities were reasonable and viewpoint neutral and therefore permissible.

### A. *Summary Judgment Standard*

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)(quoting *Anderson*, 477 U.S. at 255,

106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 329–330 (3d Cir. 1995) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial.").

■ The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

■ The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. *Weissman v. United States Postal Serv.*, 19 F.Supp.2d 254 (D.N.J. 1998). When ruling on cross-motions for summary judgment, the court must consider the motions independently, *Williams v. Philadelphia Hous. Auth.*, 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd*, 27 F.3d 560 (3d Cir.1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

B. *Plaintiff's Section 1983 Claims Related to First and Fourteenth Amendment Violations*

 There is no dispute that defendants are state actors who acted under color of state law. There is no dispute that the pre-kindergarten, kindergarten, and first grade public school classrooms where the alleged constitutional violations transpired are non-public forums, in which school officials can reasonably restrict the speech of students and teachers.[4] (*See* Pl.'s Mot. for Summ. J. at 5; Defs.' Cross-Mot. for Summ. J. at 14.) There is also no dispute that defendants allowed plaintiff to distribute his pencils and candy canes before school, during lunch or recess, and after school, and restricted the distribution of the pencils and candy canes in the classroom and during class-time only. (Walz Cert., ¶¶ 9–11.) Despite plaintiff's mother's dissatisfaction[5] with the accommodations made for the distribution of plaintiff's religious gifts, well established precedent demonstrates that there has been no violation of plaintiff Daniel Walz's constitutional rights and his motion for summary judgment will be denied, and defendants' motion for summary judgment will be granted, and plaintiff's Complaint will be dismissed, for the following reasons.

The First Amendment provides, in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech. . . ." U.S. Const. amend. I. This freedom of speech, however, is not unlimited in non-public forums.[6] "Speech uttered in a non-public forum may be subject to time place and manner regulations, and these regulations must be viewpoint-neutral and reasonably related to a legitimate governmental purpose." *C.H. v. Oliva*, 990 F.Supp. 341, 352 (D.N.J.1997), *aff'd in relevant part, vacated and remanded in part on other grounds*, 226 F.3d 198 (3d Cir.2000)(en banc), *cert. denied, Hood v. Medford Twp. Bd. of Educ.*, 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001). The First Amendment rights of children in a public school "are not automatically coextensive with the rights of adults in other settings," and must be "applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988); *C.H.*, 990 F.Supp. at

---

4. This concession obviates the need for an extended discussion of the non-applicability of cases like *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), which concerned a limited public forum and religious group access to school property that had previously been opened to the public for use. Plaintiff acknowledges the factual differences between this case and *Good News Club*, but urges that it be applied when evaluating the defendants' restriction of plaintiff's speech. As discussed below, the restriction imposed by the school was viewpoint neutral and reasonably related to pedagogical concerns, and therefore permissible.

5. Defendants raise the issue that it is actually plaintiff's mother, Mrs. Walz, who is attempting to exercise her First Amendment rights in

a public school classroom through her son. It was Mrs. Walz, not Daniel, who selected and purchased the pencils and who discovered and attached the Witness story to the candy canes. It was Daniel, however, who ultimately distributed the items to his classmates, although Mrs. Walz was present during the three instances at issue. While it is questionable that a 4½ year old child has the capacity to understand and assert his constitutional rights by handing out "Jesus ♥ the Little Children" pencils and Candy Maker's Witness candy canes, the Court will assume for the purposes of this motion that the distribution of these items was an assertion of Daniel's speech.

6. As noted above, plaintiff does not dispute that his grade school classrooms are non-public forums.

352, n. 17. "[E]ducators may 'exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.'" *C.H.*, 990 F.Supp. at 353 (quoting *Hazelwood*, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988)).

Plaintiff claims that the restrictions placed on his distribution of proselytizing pencils and evangelical candy canes are not viewpoint neutral because other children were allowed to "express themselves" by directly distributing generic gifts at the in-class seasonal parties. Plaintiff's mother, and presumably plaintiff, were dissatisfied with the school's accommodation which allowed plaintiff to distribute his religious gifts outside of the classroom and after school hours. The Court finds that this minor restriction is viewpoint neutral and extremely reasonable.

Plaintiff argues that "[s]ince the restriction addressed religious speech specifically it is automatically *not* viewpoint neutral." (Pl.'s Br. at 5.) Viewpoint neutral, however, does not mean that any regulation that relates to the viewpoint of the speech is prohibited, but rather that the regulation must be based solely upon larger pedagogical concerns rather than a particular point of view. *See C.H.*, 990 F.Supp. at 353 (citing *Duran v. Nitsche*, 780 F.Supp. 1048, 1052 (E.D.Pa.1991)(quoting *Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562)).

Plaintiff cites the United States Supreme Court's decision in *Lamb's Chapel v. Center Moriches Union Free School District* in support of his position that defendants' actions in this case were not viewpoint neutral and therefore constituted viewpoint discrimination. 508 U.S. 384, 394–95, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In *Lamb's Chapel*, the Court struck down a school policy that permitted school facilities to be used by a variety of groups during after-school hours, but excluded a group who planned to show a film containing the Christian perspective about child-rearing techniques. *See* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352. The Court found that the exclusion of the otherwise permissible film solely because it dealt with the subject [childrearing] from a religious standpoint was viewpoint discrimination. *Lamb's Chapel*, 508 U.S. at 394–95, 113 S.Ct. at 2147–48; *accord, C.H.*, 226 F.3d at 210–11 (en banc)(Alito, J., dissenting)(internal citations and quotations omitted).

The restrictions placed upon plaintiff's dissemination of his religious messages in this case is not "viewpoint discrimination" because the School District did not open a forum for the exchange of views about a subject, in which case the District could not proscribe a "religious viewpoint" unless it passed a strict scrutiny test. *See Lamb's Chapel*, 508 U.S. at 394–95, 113 S.Ct. 2141, 124 L.Ed.2d 352. Here, the contribution of generic gifts bearing no messages was permitted to all students, and this was not a forum to promote any point of view, religious or secular. The seasonal parties for pre-K, kindergarten, and first grade students were school events intended to promote sharing and caring among students, to develop social skills, and to learn about talking in turn when in a large group. Students were not told to bring gifts with their favorite seasonal message; rather, students and their parents were instructed that all gifts should be generic and donated to the PTO for distribution at the seasonal parties. Therefore, this case does not involve viewpoint discrimination in the way present in *Lamb's Chapel* or as found by Judge Alito in *C.H.* Furthermore, these parties were limited to the grade school students, their teachers, and a few parent-chaperones and

were not designed to promote any point of view, religious, commercial, or secular.

Plaintiff has come forward with no proof that other children were allowed to disseminate messages in class or at in-class, school-sponsored parties. Plaintiff concedes that no religion was treated differently or more favorably than plaintiff's Christianity. Plaintiff also concedes that the other gifts he claims that were given by children at the holiday parties were generic in nature, containing no speech whatsoever.[7] Dr. Kelpsh and plaintiff's teacher, Ms. Safaryn, testified in their depositions that children are not allowed to distribute any items that contain promotional, commercial, political or other speech. (*See* Kelpsh Dep., Tr. 62:5–64:24; Safaryn Dep., Tr. 16:2–19:19.) Additionally, the school took affirmative steps to regulate the items distributed at school parties by having the PTO, rather than individual students, collect and distribute the candies and gifts. No facts are presented by plaintiff to contradict this evidence. The school's regulation of plaintiff's speech was viewpoint neutral.

■■■ The Court further finds that the restriction was reasonably related to the school's pedagogical concerns, and also that plaintiff was offered a reasonable accommodation for the distribution of his gifts. There is no dispute that Daniel was able to distribute each religious gift and message to his classmates on school property outside the classroom setting. Plaintiff argues that this case is similar to the seminal case *Tinker v. Des Moines Indep. Cmty Sch. Dist.,* in which the Supreme Court deemed black arm bands worn by high school students in protest of the Vietnam war to be pure speech entitled to full First Amendment protections. 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731

(1969). Pre-kindergarten, kindergarten, and first grade students celebrating at an in-class party, however, are different than high school students independently expressing political beliefs. The age and grade level of the child seeking to exercise his or her speech in school is relevant and should be considered by courts determining whether the restrictions placed on speech were appropriate. *See Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)(noting that elementary school children "are impressionable and their [attendance] at school is involuntary."); *C.H.,* 226 F.3d at 203 (affirming district court's judgment that the relocation of plaintiff's Jesus poster and the restriction on plaintiff's religious story reading to his first grade classmates were reasonably related to legitimate pedagogical concerns); *DeNooyer v. Livonia Pub. Sch.,* 799 F.Supp. 744 (E.D.Mich.1992), *aff'd,* 12 F.3d 211 (6th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 193 (1994)(concluding that school's restriction of plaintiff's showing of a video to her second grade class in which she sang a religious song to be reasonable and a legitimate pedagogical concern). The Seventh Circuit expressed the justification for this greater restriction of school speech when elementary school students are involved:

> The potential 'verbal cacophony' of a public forum can be antithetical to the delicate 'custodial and tutelary' environment of an elementary school.... Declaring the elementary school classroom, hallway, or playground forums for unfettered student communication would require either a severe incursion into the critical educational mission of the elementary school or a substantial contrac-

7. Although defendants dispute that any child was allowed to directly to distribute gifts at holiday parties, there is no allegation that any of the gifts contained any message or speech.

tion of the First Amendment protections afforded speech in a public forum. Perhaps both.... In a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian that he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact.

*Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539–40 (7th Cir.1996), *cert. denied*, 520 U.S. 1156, 117 S.Ct. 1335, 137 L.Ed.2d 495 (1997) (citations omitted).

Plaintiff does not address these issues and instead attempts to distinguish the relevant cases of *Hazelwood* and *C.H.* by arguing that they were limited to speech mandated by the school's curriculum. Plaintiff argues that the school-supervised, inclass parties at which candies and treats were distributed by the PTO were purely "social activities" where "no pedagogical concerns exist." (Pl.'s Br. at 8.) The Court disagrees. There is abundant evidence that the school seasonal parties for these young children were meant to have an educational component, and also that they were highly structured, supervised, and regulated. Non-parent outsiders were not allowed to attend the party and the parties took place during school hours. Children were taught important social skills at the parties and were not permitted to freely move around or talk at will. (*See* Safaryn Dep., Tr. 14:1–15:25.) Also, it is intuitive that school activities, whether they are social or academic in focus, for four, five, and six year-old children have a high degree of structure, so that the young children are not confused or overwhelmed by

concepts and other stimuli they cannot understand. Thus, the defendants' restriction of plaintiff's gift-giving during the holiday parties was reasonably related to the important pedagogical concerns of the school.[8] Nothing has been presented in opposition from which a reasonable inference could be drawn to suggest that these pedagogical concerns were pretextual.

### C. *Establishment Clause*

■ Plaintiff additionally asserts in his brief in support of summary judgment that defendants "have engaged in hostility toward religion that the Establishment Clause itself forbids." (Pl.'s Br. at 11.) This claim was not made in plaintiff's Complaint, but since defendants raised the issue as a defense, and both parties briefed the issue, and because leave to amend pleadings should be freely given, *see* Rule 15(a), Fed.R.Civ.P., the Court will deem the Complaint amended to assert plaintiff's Establishment Clause claim and will consider whether defendants' policy violated the Establishment Clause.

The First Amendment's Establishment Clause prohibits governmental advancement or restriction of religion. U.S. Const. amend. I. The Supreme Court has written that "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion, ... favoring neither one religion over others nor religious adherents collectively over nonadherents." *C.H.*, 990 F.Supp. at 354 (quoting *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994)).

---

8. Additionally, plaintiff was and is still allowed to distribute his gifts after school. This

is an extremely reasonable accommodation.

Although not referenced by plaintiff, the inquiry for determining whether an Establishment Clause violation has occurred was set forth by the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The *Lemon* inquiry, which may or may not still be properly classified as a three-prong test to determine whether a violation of the Establishment Clause has occurred,[9] guides courts to consider whether the challenged practice (1) has a secular purpose; (2) has a principal or primary effect which neither advances nor inhibits religion; and (3) does not create an excessive entanglement of the government with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111; *Lamb's Chapel*, 508 U.S. at 395, 113 S.Ct. at 2148; *Board of Educ. of Kiryas Joel Village Sch. Dist.*, 512 U.S. at 696–97, 114 S.Ct. at 2488 (citing *Lemon* with approval); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1483 (3d Cir.1996); *ACLU v. Schundler*, 168 F.3d 92, 97 (3d Cir.1999)(citing *Lemon* with approval); *C.H.*, 990 F.Supp. at 354; *see also C.H.*, 226 F.3d at 212–13 (Alito, J., dissenting)(finding that "[t]he Establishment Clause is not violated when the government treats religious speech and other speech equally and a reasonable observer would not view the government practice as endorsing religion").

Defendants restricted the time and place where plaintiff could distribute his gifts, and that restriction was not in any way hostile to plaintiff's Christianity. The students were prohibited, under the defendants' policy, from contributing gifts bearing any message, whether political, commercial, or religious, such that religious messages were not singled out but were grouped with similar forms of speech. Perhaps the Establishment Clause would be implicated if the policy permitted distribution of all gifts containing any messages except religious messages, since the policy might show disapproval of religion, *per se*. *See Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)(emphasizing importance of discerning whether the challenged policy is designed to "endorse or disapprove of religion").

Although it is true that plaintiff was prevented from distributing his gifts in class because of their message, which was of a religious nature, and because he sought to give them individually rather than contribute them to the collective PTO effort, the defendants' actions in this case did not advance or inhibit religion as such, and did not create any type of excessive entanglement with religion. Defendants' restriction upon all political, commercial and religious endorsements, particularly when the age of the schoolchildren is considered, could not be found by a fair-minded factfinder to be anything but reasonable.[10] Additionally, plaintiff was al-

---

**9.** This Court recognizes that the three-prong *Lemon* test has been criticized on a number of levels, and by several Supreme Court Justices, but that it has not been overruled and the spirit of the inquiry is as applicable to determining whether an Establishment Clause has occurred as any other suggested by its critics. *See Lamb's Chapel*, 508 U.S. at 397, 113 S.Ct. at 2149 (Kennedy, J., concurring in part and concurring in the judgment), 508 U.S. at 397–98, 113 S.Ct. at 2149 (Scalia, J., concurring in the judgment); *see also Tangipahoa Parish Bd. of Educ. v. Freiler*, 530 U.S. 1251, 120

S.Ct. 2706, 147 L.Ed.2d 974 (2000)(mem.), denying cert. 185 F.3d 337 (5th Cir.1999)(Scalia, J., dissenting)(detailing criticism of, but not overruling the validity of, the *Lemon* inquiry).

**10.** Further, if the defendants had made an exception to the policy, to permit plaintiff's religious message while precluding other messages, the possibility is real that a reasonable observer would perceive the defendants as endorsing this religious message. *See County of Allegheny v. ACLU*, 492 U.S. 573,

lowed to distribute his gifts on school premises outside of class time. There was simply no excessive entanglement with plaintiff's religion posed by defendants' simple, common-sense accommodation which permitted him to distribute his gifts to classmates of his choice outside the class while on school premises. Defendants, therefore, did not violate the Establishment Clause.

### D. *Plaintiff's NJLAD Claims*

■ Plaintiff additionally claims in his Complaint that defendants "withheld from Plaintiff accommodations, advantages, facilities, and privileged available to other students" and therefore violated the New Jersey Law Against Discrimination. (Pl.'s Br. at 14.) Plaintiff alleges that "[o]ther students were allowed to give out gifts in class" while plaintiff was not allowed to distribute his religious messages, but points to no specific instances where other children were allowed to give direct gifts and concedes that any such gifts that might have been distributed were generic.

The applicable section of the NJLAD provides that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation ... without discrimination because of ... creed, subject only to conditions and limitations applicable alike to all persons." N.J.S.A. 10:5-4. Plaintiff has not been denied any accommodation, advantage, facility, or privilege of his public school[11] based on his Christian faith. There is no legal precept under the NJLAD which mandates that a child be able to distribute

religious messages in his public grade school class. Plaintiff has not cited one case finding a violation of the NJLAD arising from facts similar to those present in this case. Plaintiff also has not alleged that other children were allowed to distribute gifts with religious messages from non-Christian faiths. Additionally, plaintiff was not excluded from the holiday parties, nor was he prevented from distributing his religious gifts after school. Plaintiff's claim under the NJLAD thus fails.

### III. *CONCLUSION*

For the foregoing reasons, the Court will grant defendants' motion for summary judgment and will dismiss plaintiff's complaint with prejudice. The accompanying Order will be entered.

### ORDER

THIS MATTER having come before the court on plaintiff's motion for summary judgment, and defendants' cross-motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P.; and the Court having considered the submissions of the parties; and for the reasons stated in the accompanying Opinion;

**IT IS** on this day of February 2002, hereby

**ORDERED** that defendants' cross-motion for summary judgment [Docket Item 13–1] be, and hereby is, *GRANTED*, and plaintiff's motion for summary judgment [Docket Item 12–1] be, and hereby is *DISMISSED*; and

---

605, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)(in which majority of Justices endorsed the principle that the Establishment Clause "certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)").

11. Public schools, such as the one attended by plaintiff, are places of public accommodation under the NJLAD. *See Hinfey v. Matawan Reg'l Bd. of Educ.*, 77 N.J. 514, 523, 391 A.2d 899 (1978).

**IT IS FURTHER ORDERED** that plaintiff's Complaint is hereby ***DISMISSED WITH PREJUDICE.***