

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2003

# Walz v. Egg Harbbor Township Board of Education

Precedential or Non-Precedential: Precedential

Docket No. 02-1665P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Walz v. Egg Harbbor Township Board of Education" (2003). *2003 Decisions.* Paper 309.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/309

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1665

DANIEL WALZ,
by his Guardian Ad Litem DANA P. WALZ

v.

EGG HARBOR TOWNSHIP BOARD OF EDUCATION;
DR. LEONARD KELPSH, in his OFFICIAL CAPACITY AS
SUPERINTENDENT OF EGG HARBOR TOWNSHIP SCHOOLS

Daniel Walz, by his Guardian
Ad Litem Dana P. Walz,
Appellant

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 00-cv-02149
(Honorable Jerome B. Simandle)

Argued January 9, 2003

Before: SCIRICA, *Chief Judge**, BARRY and SMITH, *Circuit Judges*

(Filed  August 27, 2003)

*Judge Scirica began his term as Chief Judge on May 4, 2003.

MICHAEL P. LAFFEY, ESQUIRE (ARGUED)
Cassiday, Messina & Laffey
961 Holmdel Road
Holmdel, New Jersey 07733

      Attorney for Appellant


ARMANDO V. RICCIO, ESQUIRE (ARGUED)
Capehart & Scatchard
Laurel Corporate Center
800 Midlantic Drive, Suite 300
C.S. 5016
Mount Laurel, New Jersey 08054

      Attorney for Appellees


KEVIN J. HASSON, ESQUIRE
The Becket Fund for Religious Liberty
1350 Connecticut Avenue, N.W., Suite 605
Washington, D.C. 20036

      Attorney for *Amicus Curiae* Appellant,
      Carol Hood

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

In this appeal, we address whether an elementary school student has a First Amendment right to promote an unsolicited religious message during an organized classroom activity.

**I.**

Daniel Walz was a student in pre-kindergarten in the spring of 1998. His school, like other elementary schools in Egg Harbor Township, held seasonal, in-class parties several times a year. Organized by teachers and students' parents, the parties generally consisted of a parent-provided snack followed by games and activities. Significant for our purposes, there was usually an exchange of small gifts.

Just prior to Easter, Daniel's class held a seasonal party. The children's parents were encouraged to donate gifts to the local Parent Teacher Organization, which brought the gifts to the holiday party. Explaining why the PTO undertook this role, Dr. Leonard Kelpsh, the Egg Harbor Township school superintendent, said:

> [S]ocially, economically, [our student body is] very diverse, and we just don't like to take the risk that, one, kids would see other kids doing it and feel they have to do it, and they can't afford to do it; and two, you know, sometimes kids don't get everyone in the class something.

According to Dana Walz, Daniel's mother and one of the parents in charge of collecting gifts for the PTO, the PTO generally would mail out requests for "candy, pencils, whatever" from parents. Parents and children generally would respond to those requests with generic donations.

At this particular party, Daniel brought his gifts directly to class where he distributed pencils to his classmates with the imprint, "Jesus [Loves] The Little Children" (heart symbol). Mrs. Walz had purchased the pencils at a local store because she thought

the pencils were "pretty . . . and [Daniel] liked them. . . .  We both thought that [the pencils] would be his little gift at Easter, at the Easter party or the spring party."

Daniel's teacher noticed the pencils' imprint and confiscated them.  She brought this matter to the attention of the school principal, who contacted Dr. Kelpsh.  School superintendent Kelpsh determined the pencils could not be distributed because the young children and their parents might perceive the message as being endorsed by the school.

On October 13, 1998, six months after the party, the Egg Harbor Board of Education adopted a written policy on the recognition of religion in its schools.  It provided, in part, that "no religious belief or non-belief shall be promoted in the regular curriculum or in district-sponsored courses, programs or activities, and none shall be disparaged."  Religion may be acknowledged in the course of school activities "if presented in an objective manner and as a traditional part of the culture and religious heritage of the particular holiday."

The school also maintained an unwritten policy on student expression.  According to Dr. Kelpsh, items with political, commercial, or religious references were not allowed to be distributed in class during school hours.  A school's job, said Dr. Kelpsh, was "to develop curriculum," not "endorse" a particular viewpoint.  Under the school's policy, according to Dr. Kelpsh, a student would not be allowed to distribute pencils that stated "Home Depot" or "Support the [New Jersey Education Association]."

4

In December 1998, Daniel's kindergarten class held a seasonal holiday party, where Daniel sought to distribute candy canes to his classmates. Attached to the candy canes was a religious story, entitled "A Candy Maker's Witness." The story read:

A Candymaker in Indiana wanted to make a candy that would be a witness, so he made the Christmas Candy cane. He incorporated several symbols for the birth, ministry, and death of Jesus Christ.

He began with a stick of pure white, hard candy. White to symbolize the Virgin Birth and the sinless nature of Jesus, and hard to symbolize the Solid Rock, the foundation of the Church, and firmness of the promises of God.

The candymaker made the candy in the form of a "J" to represent the precious name of Jesus, who came to earth as our Savior. It could also represent the staff of the "Good Shepherd" with which He reaches down into the ditches of the world to lift out the fallen lambs who, like all sheep, have gone astray.

Thinking that the candy was somewhat plain, the candymaker stained it with red stripes. He used three small stripes to show the stripes of the scouring [sic] Jesus received by which we are healed. The large red stripe was for the blood shed by Christ on the cross so that we could have the promise of eternal life.

Unfortunately, the candy became known as a Candy Cane [sic] a meaningless decoration seen at Christmas time. But the meaning is still there for those who "have eyes to see and ears to hear." I pray that this symbol will again be used to witness to The Wonder of Jesus and His Great Love that came down at Christmas and remains the ultimate and dominant force in the universe today.

According to Mrs. Walz, she made the decision to attach the story to the candy canes because of its religious significance. She contacted Daniel's school before the holiday party and was informed that Daniel could distribute the candy canes and the attached story to his classmates, but only before school, during recess, or after school, not during the classroom party itself. Daniel planned to give the candy canes to his

5

classmates as they left school for the day, but a rainstorm caused him to distribute them in the hallway outside of the classroom.

A year later, in December 1999, a memorandum from two teacher coordinators was distributed to parent room representatives, including Mrs. Walz, providing guidelines on the "dos and don'ts" for the upcoming holiday party. Parents were requested to provide food and refreshments and prepare activities and games. The memorandum instructed that the party be "as generic as possible." To that end, parent representatives were advised to "choose projects that express the season, such as snowmen versus Santa."

Later that month, Daniel, now a first-grade student, attempted to distribute the candy canes and "Candy Maker's Witness" story during the classroom party, but was prohibited by school officials. The officials permitted him to distribute the candy canes in the hallway outside the classroom, at recess, or after school as students were boarding buses. Mrs. Walz acknowledged the items distributed at the party by others were, in fact, generic in nature.

Daniel Walz, through his mother, sued the Egg Harbor Township Board of Education and Dr. Kelpsh in his official capacity as school superintendent under 42 U.S.C. § 1983, alleging violations of the First Amendment (freedom of expression and free exercise of religion) and equal protection under the Fourteenth Amendment, and under the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1 to -49. The complaint alleged a continuing violation based on Daniel's attempts to distribute candy

6

canes and the accompanying story at school holiday parties. In his complaint, Daniel sought a declaration that the school's policy was unconstitutional and an injunction prohibiting defendants from enforcing the policy. Both parties asked for summary judgment. The District Court granted summary judgment in favor of defendants and Daniel Walz filed a timely appeal.[1]

## II.

Daniel Walz alleges the school violated his constitutional rights by prohibiting him from distributing the pencils and the candy canes during the classroom holiday parties. At the threshold is an inquiry whether his attempted conduct constituted expressive activity under the First Amendment.

The District Court concluded:

> The facts leave little doubt that plaintiff's mother, Dana Walz, is the driving force behind the distribution of these items and this lawsuit. It is highly unlikely that plaintiff, who was only 4 1/2 at the time he attempted to distribute the pencils, was able to independently read and advocate the dissemination of the message on the pencils. Additionally, Mrs. Walz has consistently inquired about and challenged the school's limitations on the distribution of such items and she is the one who is dissatisfied with the accommodations made by the school. The Court will, however, for the purposes of these summary judgment motions, assume that plaintiff, now nine, was attempting to freely speak and exercise his religious beliefs when distributing these items to his young classmates.

---

[1]We have jurisdiction to review de novo the District Court's grant of summary judgment under 28 U.S.C. § 1291.

*Walz by Walz v. Egg Harbor Twp. Bd. of Educ.*, 187 F. Supp. 2d 232, 234 n.1 (D.N.J. 2002).

Whether Daniel's attempted conduct merits First Amendment protection depends on whether it represented Daniel's own expression and whether he suffered an injury of constitutional dimension.

As the District Court noted, Daniel was in pre-kindergarten when he brought the "Jesus [Loves] The Little Children" pencils to the holiday party. Furthermore, Dana Walz appears to have driven her son's activity and this litigation. Although we doubt whether the distribution of the pencils constituted Daniel's own expression, other courts have recognized that a student of similar age can understand and interpret basic principles of religious expression. *See, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 42 (1985) (rejecting a state law authorizing a period of silence for voluntary prayer in a matter involving a kindergartner); *DeSpain v. DeKalb County Comm. Sch. Dist.*, 384 F.2d 836, 837 (7th Cir. 1967) ("We are of the view that the verse is a prayer and that its compulsory recitation by kindergarten students in a public school comes within the proscription of the first amendment . . . ."). In any event, since we find the school's action in preventing the distribution of the pencils was justified, this question is not dispositive here.

## III.

## A.

In the elementary school setting, age and context are key.[2] Elementary schools are responsible for teaching young children basic social, behavioral, and academic lessons in a structured environment. *See Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("Families entrust public schools with the education of their children . . . ."); *Bd. of Educ. v. Pico*, 457 U.S. 853, 894 (1982) (Powell, J., dissenting) ("Unlike the governing bodies of cities and counties, school boards have only one responsibility: the education of the youth of our country during their most formative and impressionable years. Apart from health, no subject is closer to the hearts of parents than their children's education during those years."). Elementary educators design a structured curriculum to facilitate reaching these pedagogical and behavioral goals. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) ("[A] school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on

---

[2]We have examined the elementary school setting previously. In *C.H. v. Oliva*, 226 F.3d 198 (3d Cir. 2000) (en banc), an en banc court equally divided on the First Amendment claims of a first-grader, and accordingly affirmed the District Court without further explication. *Id.* at 200. In *Walker-Serrano by Walker v. Leonard*, we found that although plaintiff had not suffered an injury of constitutional dimension, "[t]here can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students." 325 F.3d 412, 416-17, 419 (3d Cir. 2003). Moreover, in *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996), the Court of Appeals for the Seventh Circuit addressed but did not reach agreement on the question of what speech rights elementary school children possess.

potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting.").

While school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), a school's need to control student behavior will necessarily result in limitations on student speech.[3] A quiet reading period necessarily requires silence, and a "show and tell" exercise may be restricted to age-appropriate items to prevent unsuitable discussions in a kindergarten classroom. *E.g.*, *Walker-Serrano*, 325 F.3d at 416 ("[A]ny analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an environment conducive to learning on the other, must necessarily take into account the age and maturity of the student.").

In conventional elementary school activities, the age of the students bears an important inverse relationship to the degree and kind of control a school may exercise: as a general matter, the younger the students, the more control a school may exercise. *See Sch. Dist. v. Schempp*, 374 U.S. 203, 290-91 n. 69 (1963) (Brennan, J., concurring) ("[T]he susceptibility of school children to prestige suggestion and social influence within the school environment varies inversely with the age, grade level, and consequent degree of sophistication of the child."); *S.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 423 (3d

---

[3]The term speech generally encompasses student expression.

10

Cir. 2003) ("[A] school's authority to control student speech in an elementary school setting is undoubtedly greater than in a high school setting."). A school must be able to restrict student expression that contradicts or distracts from a curricular activity. Where student expression interferes with the legitimate teaching of an organized and pedagogically-based classroom activity, a school may reasonably restrict or limit expression beyond the bounds of what the activity intends to teach. *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002) ("Speech that disrupts education, causes disorder, or inappropriately interferes with other students' rights may be proscribed or regulated."); *see also Hazelwood*, 484 U.S. at 280 (Brennan, J., dissenting) ("Free student expression undoubtedly sometimes interferes with the effectiveness of the school's pedagogical functions. Some brands of student expression do so by directly preventing the school from pursuing its pedagogical mission: The young polemic who stands on a soapbox during calculus class to deliver an eloquent political diatribe interferes with the legitimate teaching of calculus.").

As a general matter, the elementary school classroom, especially for kindergartners and first graders, is not a place for student advocacy. To require a school to permit the promotion of a specific message would infringe upon a school's legitimate area of control. *Hazelwood*, 484 U.S. at 271 ("Educators are entitled to exercise greater control over [school-sponsored expressive activities] to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to

material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school."). Curricular standards, especially those that occur in kindergarten and first grade, when children are most impressionable, should not be lightly overturned. *See Edwards*, 482 U.S. at 584 (noting elementary school children "are impressionable").

Furthermore, in an elementary school classroom, the line between school-endorsed speech and merely allowable speech is blurred, not only for the young, impressionable students but also for their parents who trust the school to confine organized activities to legitimate and pedagogically-based goals. *See Edwards*, 482 U.S. at 584 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary."). While "secondary school students are mature enough and are likely to understand that a school does not endorse or support speech that it merely permits on a nondiscriminatory basis," *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality), kindergartners and first graders are different. Furthermore, schools may wish to avoid the appearance of endorsing certain student speech. *See Hazelwood*, 484 U.S. at 271 (censoring the text of a school newspaper article is permissible to prevent the perception of endorsement).

12

Determining the appropriate boundaries of student expression is better handled by those charged with educating our youth. School officials who exercise judgment based on their expertise and authority should be afforded leeway in making choices designed to foster an appropriate learning environment and further the educational process. *See id.* at 273 ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."); *Walker-Serrano*, 325 F.3d at 419 ("The number of everyday decisions that must be made with respect to the boundaries of acceptable behavior of third graders is so great that courts cannot second guess elementary school officials on every minor dispute involving third graders' expression."); *Sypniewski*, 307 F.3d at 260 ("[P]ublic secondary and elementary school administrators are granted more leeway than public colleges and universities or legislative bodies."). Accordingly, where an elementary school's purpose in restricting student speech within an organized and structured educational activity is reasonably directed towards preserving its educational goals, we will ordinarily defer to the school's judgment.

**B.**

In an elementary school setting, the appropriateness of student expression depends on several factors, including the type of speech, the age of the locutor and audience, the school's control over the activity in which the expression occurs, and whether the school solicits individual views from students during the activity. *Cf. Rosenberger v. Univ. of*

13

*Va.*, 515 U.S. 819, 834 (1995) (applying strict scrutiny to discrimination based on religious viewpoint where state institution solicits a diversity of views from students); *Planned Parenthood v. Clark County Sch. Dist.*, 941 F.2d 817, 828-29 (9th Cir. 1991) (en banc) (editorial control over the speech and specific approval by the school were factors in finding the public would likely perceive the speech to bear the imprimatur of the school).

The appropriateness of student speech must be viewed in its educational context. For a student in "show and tell" to pass around a Christmas ornament or a dreidel, and describe what the item means to him, may well be consistent with the activity's educational goals; likewise, a lesson that includes a mock debate invites individual student expression on the relevant topic. In those scenarios, the student speaker is expressing himself in the context of a school assignment or activity where the school has sought students' personal views.[4]

Nevertheless, in the context of an organized curricular activity, an elementary school may properly restrict student speech promoting a specific message. *See C.H.*, 226 F.3d at 211 (Alito, J., dissenting) ("Public school teachers have the authority to specify

---

[4]The Supreme Court has made this distinction in the university setting. *Rosenberger*, 515 U.S. at 834 ("It does not follow . . . that viewpoint-based restrictions are proper when the University . . . expends funds to encourage a diversity of views from private speakers."). While an elementary school deserves greater discretion to control its curricular activities, individual student expression still may be appropriate depending on the context.

14

the subjects that students may discuss in class and the subjects of assignments that students are asked to complete. Thus, if a student is asked to solve a problem in mathematics or to write an essay on a great American poet, the student clearly does not have a right to speak or write about the Bible instead.") (citations omitted); *cf. Chandler v. James*, 180 F.3d 1254, 1265 (11th Cir. 1999) ("[A] student's right to express his personal religious beliefs does not extend to using the machinery of the state as a vehicle for converting his audience.").

Context is essential in evaluating student speech in the elementary school setting. It would seem reasonable that student expression may implicate religion if done out of personal observance as opposed to outward promotion.[5] There is a marked difference between expression that symbolizes individual religious observance, such as wearing a cross on a necklace, and expression that proselytizes a particular view. *See Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1053 (9th Cir. 2003) ("[T]he District cannot refuse to distribute literature advertising a program with underlying religious content where it distributes quite similar literature for secular summer camps, but it can refuse to distribute literature that *itself* contains proselytizing language. The difference is subtle

---

[5]The Egg Harbor Board of Education's policy on this subject seems appropriate. It provides that "no religious belief or non-belief shall be promoted in the regular curriculum or in district-sponsored courses, programs or activities, and none shall be disparaged." Under the policy, religion may be acknowledged in the course of school activities "if presented in an objective manner and as a traditional part of the culture and religious heritage of the particular holiday."

but important.") (emphasis in original). Individual student expression that articulates a particular view but that comes in response to a class assignment or activity would appear to be protected. But, of course, individual student expression that is or is likely to be disruptive may be properly restricted.

## C.

Here, plaintiff's counsel stipulated that the pencils and candy cane stories "have a religious message. They were picked in part because they had a religious message, and it was the party's intention to disseminate that religious message."[6] Daniel Walz's promotion of his religion occurred during classroom activities that had a clearly defined curricular purpose to teach social skills and respect for others in a festive setting.

---

[6]Daniel Walz averred two additional claims in his complaint, both of which the District Court properly denied. First, he alleged the school's policy "engaged in hostility toward religion that the Establishment Clause itself forbids." But, under the Supreme Court's oft-quoted test in *Lemon v. Kurtzman*, 411 U.S. 192 (1973), the school's policy did not advance or inhibit religion and did not create any type of "excessive entanglement" with religion. Instead, the policy was neutral towards religion by prohibiting all endorsements of specific messages, including those with commercial, political, or religious undertones. In not isolating religious messages, the policy does not implicate the Establishment Clause. Second, Daniel Walz alleged a violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1 to -49. The NJLAD provides that "[a]ll persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . creed, . . . subject only to conditions and limitations applicable alike to all persons." *Id.* at § 10:5-4. But Daniel has not been denied any accommodation, advantage, facility, or privilege. He was not excluded from the holiday parties, nor was he prevented from distributing his religious gifts after school or in the hallways. Thus, we will affirm the District Court's denial of the NJLAD claim.

16

Because of the tender age of the students, the school prohibited the exchange of gifts with commercial, political, religious, or other undertones that promoted a specific message.

The District Court found "abundant evidence that the school seasonal parties for these young children were meant to have an educational component, and also that they were highly structured, supervised, and regulated." *Walz*, 187 F. Supp. 2d at 241. Several factors combined to demonstrate school control: the teacher's role in planning the holiday parties, the PTO's control over the gift distribution, and the directive of generic gifts. At no point during the holiday parties did the school solicit individual views from the young students about the significance of the holiday to them personally.

Daniel Walz skirted the structure of this organized activity by bringing gifts that promoted a specific religious message. Although he was not the only student to exchange gifts directly with his classmates rather than through the PTO, he was the only student to bring a non-generic gift.

It was well within the school's ambit of authority to prevent the distribution of these items during the holiday parties. The seasonal holiday parties were instructional activities, as much a part of the curriculum as "show and tell" or art class. Students were asked in advance—through a letter to their parents—to donate generic gifts like candy and No. 2 pencils to the PTO. The subsequent exchange of gifts was intended as a teaching tool to promote sharing. The gift-giving from one student to another was not intended to promote a particular religious message.

17

While this suit alleges a continuing violation—as Daniel continues to attempt to distribute the "Candy Maker's Witness" story during holiday parties—the school has never punished Daniel for his repeated attempts to skirt the holiday parties' rules. And unlike the distribution of the pencils, which the school never permitted, the school has allowed Daniel to give the candy cane stories to his classmates in the school hallway after class or at recess. This accommodation seems more than reasonable and perhaps even unnecessary. *Cf. Walker-Serrano*, 325 F.3d at 419 ("Absent punishment for expression, a significant pattern of concrete suppression, or some other form of clear suppression of the expression of elementary school students, a federal First Amendment action is not an appropriate forum for resolution of disputes over schools' control of third graders' conduct."). Therefore there was no deprivation of Daniel's First Amendment rights with respect to the candy cane stories.

## IV.

Nevertheless, the school prohibited Daniel's distribution of the pencils, and he has alleged a constitutional injury. As noted, elementary school students retain certain First Amendment rights of expression. *See Wallace*, 472 U.S. at 42 (state law authorizing a period of silence for meditation or voluntary prayer is unconstitutional for kindergartners); *W. Va. v. Barnette*, 319 U.S. 624, 637 (1948) ("That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach

18

youth to discount important principles of our government as mere platitudes."). And where the school solicits individual views in a classroom assignment, students should be able to respond in a non-disruptive manner.

Plaintiff contends "[h]anding out pencils which stated 'Jesus [Loves] The Little Children' is essentially no different than if Plaintiff had turned to his classmates during snack time and stated, 'Jesus loves the little children.'" We disagree. Where a student speaks to his classmates during snack time, he does so as an individual. But absent disruption, this is fundamentally different from a student who controverts the rules of a structured classroom activity with the intention of promoting an unsolicited message.

In short, Daniel Walz was not attempting to exercise a right to personal religious observance in response to a class assignment or activity. His mother's stated purpose was to promote a religious message through the channel of a benign classroom activity. In the context of its classroom holiday parties, the school's restrictions on this expression were designed to prevent proselytizing speech that, if permitted, would be at cross-purposes with its educational goal and could appear to bear the school's seal of approval. *See Hazelwood*, 484 U.S. at 273 ("[W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to

legitimate pedagogical concerns.").[7]  Given its valid educational purpose, the school's

action here was appropriate.  *See id*. ("It is only when the decision to censor . . . student

expression has no valid educational purpose that the First Amendment is so directly and

sharply implicated as to require judicial intervention to protect students' constitutional

rights.") (quotation omitted).

     For the foregoing reasons, we will affirm the judgment of the District Court.

<div style="margin-left:50%">

/s/ Anthony J. Scirica
*Chief Judge*

</div>

---

[7]Elementary school marks a child's introduction to formal public education and requires a parents to entrust their child's development to another adult mentor.  *See Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 231 (1948) (opinion of Frankfurter, J.) (quoted with approval in *Edwards*, 482 U.S. at 584) ("The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny.").  During these formative years, elementary school educators must be able to structure an appropriate curriculum to achieve the desired pedagogical and behavioral goals.