

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-5-2009

# Busch v. Marple Newtown Sch

Precedential or Non-Precedential: Precedential

Docket No. 07-2967

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Busch v. Marple Newtown Sch" (2009). *2009 Decisions*. Paper 1106.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

AMENDED PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-2967

———————

DONNA KAY BUSCH,
IN HER INDIVIDUAL CAPACITY
AND AS THE PARENT AND NEXT FRIEND
OF WESLEY BUSCH, A MINOR

v.

MARPLE NEWTOWN SCHOOL DISTRICT;
MARPLE NEWTOWN SCHOOL DISTRICT
BOARD OF DIRECTORS;
ROBERT MESAROS, SUPERINTENDENT OF THE
MARPLE NEWTOWN SCHOOL DISTRICT;
THOMAS COOK, PRINCIPAL OF
CULBERTSON ELEMENTARY SCHOOL

Donna Kay Busch,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 05-cv-02094
(District Judge: Honorable R. Barclay Surrick)


Argued May 5, 2008
Before: SCIRICA, *Chief Judge*,
BARRY and HARDIMAN, *Circuit Judges*.


(Filed: June 1, 2009)

JASON P. GOSSELIN, ESQUIRE (ARGUED)
J. FREEDLEY HUNSICKER, JR., ESQUIRE
JARROD D. SHAW, ESQUIRE
KATHERINE L. VILLANUEVA, ESQUIRE
Drinker, Biddle & Reath
One Logan Square
18th and Cherry Streets
Philadelphia, Pennsylvania 19103
        Attorneys for Appellant

MARK A. SERENI, ESQUIRE (ARGUED)
DiOrio & Sereni
21 West Front Street
P.O. Box 1789

Media, Pennsylvania 19063

ELLIS H. KATZ, ESQUIRE
JONATHAN P. RIBA, ESQUIRE
Sweet Stevens Tucker & Katz
331 East Butler Avenue
P.O. Box 5069
New Britain, Pennsylvania 18901
        Attorneys for Appellees

DAVID A. CORTMAN, ESQUIRE
Alliance Defense Fund
1000 Hurricane Shoals Road
Building D, Suite 600
Lawrenceville, Georgia 30043
        Attorney for Amici Curiae-Appellant,
        Alliance Defense Fund and
        Pennsylvania Family Institute

JAMES M. BECK, ESQUIRE
DIANE S. DANOFF, ESQUIRE
Dechert LLP
Cira Centre, 18th Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
        Attorney for Amicus Curiae-Appellees,
        The Anti-Defamation League

MARC D. STERN, ESQUIRE
American Jewish Congress
825 Third Avenue, Suite 1800
New York, New York 10022
Attorney for Amicus Curiae-Appellees,
The American Jewish Congress

JEFFREY I. PASEK, ESQUIRE
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, Pennsylvania 19103
Attorney for Amicus Curiae-Appellees,
The Jewish Social Policy Action Network

EDWARD B. SCHWARTZ, ESQUIRE
DLA Piper
500 8th Street, N.W.
Washington, D.C. 20004
Attorney for Amicus Curiae-Appellees,
Americans United for Separation of Church and State

EMILY J. LEADER, ESQUIRE
Pennsylvania School Boards Association
400 Bent Creek Boulevard
P.O. Box 2042
Mechanicsburg, Pennsylvania 17055
Attorney for Amicus Curiae-Appellees,
Pennsylvania School Boards Association

FRANCISCO M. NEGRON, JR., ESQUIRE
National School Boards Association
1680 Duke Street
Alexandria, Virginia 22314
        Attorney for Amici Curiae-Appellees,
        National School Boards Association and
        Pennsylvania School Boards Association

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

Plaintiffs, who are mother and son, bring free speech, establishment, and equal protection claims against Defendants, who are school officials and the school district. These claims stem from an elementary school's restriction of the mother's effort to read aloud from scripture to students in her son's kindergarten classroom as part of a curricular "show and tell"-type activity. The District Court granted summary judgment in favor of Defendants on all claims. We will affirm.

I

Donna Kay Busch[1] is the mother of Wesley Busch, a kindergarten student at Culbertson Elementary School of the Marple Newtown School District, who was age five at the time this matter arose. Busch describes herself as an Evangelical Christian,[2] and Wesley shares his mother's religious beliefs. Busch and Wesley routinely read the Bible together at breakfast and before going to bed, and Wesley often carries the Bible with him.

In October 2004, as a student in teacher Jaime Reilly's kindergarten class, Wesley participated in a curricular unit called "All About Me." The unit was part of the social studies curriculum and was designed to be a "socialization" program in which students would "identify individual interests and learn about others" and would "identify sources of conflict with others and ways that conflicts can be resolved."

Each student in Reilly's class was featured during his or her own "All About Me" week, and during the designated week, the curriculum called for the student's participation in three ways. First, each student was given the opportunity to "share

---

[1] Because Donna Kay Busch brings claims on Wesley's behalf, we will refer to her as the central litigant.

[2] Busch testified that an Evangelical Christian is "someone who believes . . . the Bible is the literal word of God." Her husband described an Evangelical as "one who brings God's word to the world."

information about themselves [sic]" by bringing in "a poster with pictures, drawings or magazine cut outs of [his or her] family, hobbies or interests." Second, the student was also permitted to bring a snack to share as well as a special toy or stuffed animal to introduce to the class. Third, Reilly invited parents to participate in the unit by visiting the school to "share a talent, short game, small craft, or story" with the class during their child's designated week.

As one aspect of Wesley's participation in his "All About Me" week, he made a poster with his mother that included photographs of himself with his hamster, his brothers, his parents, his best friend at the time, and a picture of a church cut out from construction paper. Busch testified that she wrote what Wesley asked her to write under the picture of the church: "I love to go to the House of the Lord" or "I like to go to church" or "something like that." The poster was displayed in Wesley's classroom. And Wesley, like other students, had the opportunity to present his poster to the class and talk about the various items on it.

On October 15, 2004, Busch was scheduled to visit Wesley's class to participate in his "All About Me" week. She told Wesley that Reilly invited her to visit class and read his favorite book. When she asked him what he would like her to read, Wesley responded, "the Bible."[3]

_____

[3]Wesley's babysitter, Judy Harper, testified that Wesley's favorite book in kindergarten was *Brown Bear, Brown Bear*.

The night before her visit to Wesley's class, Busch, alone, without Wesley, pondered what passage she would read from the Bible.  Eventually she selected verses 1 through 4 and verse 14 of Psalm 118 from the King James Bible:

1    Give thanks unto the Lord, for he is good;
     because his mercy endures forever.

2    Let Israel now say, his mercy endures
     forever.

3    Let the house of Aaron now say, that his
     mercy endures forever.

4    Let them now that fear the Lord say, that
     his mercy endures forever.

                  * * *

14   The Lord is my strength and my song, and
     is become my salvation.

Busch testified she chose these verses because (1) she and Wesley frequently read from the Book of Psalms; (2) she thought the children would like Psalms because they are similar to poetry; and (3) she desired a reading that did not make reference to Jesus, which she worried might upset some people given what she perceived in the past as hostility in the school district towards her Christian beliefs.  She also testified that she intended to read the verses to the students without explanation

Nevertheless, on summary judgment, we assume that Wesley's favorite book was the Bible and that the Bible was chosen according to his preference.

and that, if asked questions about the reading, she would respond that "it was ancient psalms and ancient poetry and one of Wesley's favorite things to hear."

On the morning she was supposed to read to Wesley's class, Busch informed Reilly of her decision to read from the Bible. Reilly said she would have to check with the school's principal, Thomas Cook, who then arrived and spoke to Busch in the hallway. He told Busch reading the Bible to the class would be "against the law . . . of separation of church and state" and asked her to read from another book. Principal Cook testified he determined it was improper to read from the Bible to a class of kindergarten students because he believed "the Bible is holy scripture. . . . [I]t's the word of God. And . . . reading that to kindergarten students is promoting religion and it's proselytizing for promoting a specific religious point of view."[4] Busch testified that she remembered Cook using the word "proselytizing" and that she understood him to be saying it was against the law for her to try to "convert souls."

Busch objected, telling Cook that her other son, age six, had just finished reading a book called *Gershon's Monster: A*

---

[4]Robert Mesaros, Superintendent of the Marple Newtown School District, later supported Principal Cook's response to Busch based on the captive nature of the classroom audience, the parent appearing to "tak[e] the place of the teacher" in the classroom, and the likely perception that the school district was advocating or supporting whatever was going to be read.

*Story for the Jewish New Year*, which he had obtained from the school library.  Cook responded: "Well, that's cultural and your son chose that book and these children are not choosing to hear from the Bible. . . . I can't let you do it."  Reilly offered Busch another book to read, and they settled on a book about counting.  Reilly testified the hallway conversation was inaudible in the classroom, she never spoke with Wesley or the other children about the incident, and she did not notice any change in Wesley's behavior or demeanor that day.

Other parents also participated in their children's "All About Me" weeks by reading stories to the class, sharing snacks, and doing crafts.  Among the stories read by parents were: *The Grinch Who Stole Christmas*, *The Jolly Roger*, and *Green Eggs and Ham*.  Reilly also keeps a library of books from which she periodically reads to Wesley's class.  Among those books are several about holidays, including: *Bear Stays Up for Christmas*, *Froggy's Best Christmas*, *The Wild Christmas Reindeer*, *Ten Timid Ghosts on a Christmas Night*, *Christmas Trolls*, *The Best Easter Eggs Ever*, *Easter Bunny's On His Way*, *The Night Before Easter*, *Hooray for Hanukkah*, *The Magic Dreidels*, and *The Hanukkah Mice*.

Additionally, one parent, Linda Lipski, visited Reilly's class twice during the year to give presentations on Hanukkah and Passover that were planned in advance with Reilly.  During Hanukkah, Lipski brought in a menorah and a dreidel and read "a Blue's Clues Hanukkah story."  Later in the year, during the Passover holiday, Lipski "read *The Matzoh Ball Fairy* to the

students and then offered them matzoh ball with chicken soup."[5] Reilly set up Lipski's presentation by discussing Easter and Passover. She also discussed Christmas and Kwanzaa as part of the winter holiday unit in the social studies curriculum, and recalled a picture of a Christmas tree hanging in the classroom at the time of the Hanukkah presentation. Reilly explained she was comfortable permitting the holiday materials and presentations because (1) the holidays were part of the official social studies curriculum, (2) the menorah and dreidel were symbols used on activity sheets in that curriculum, and (3) they appeared consistent with the Marple Newtown School District's policy on holiday observances.

On May 3, 2005, Busch filed this lawsuit on behalf of herself and Wesley against the Marple Newtown School District, the Marple Newtown School District Board, School District Superintendent Robert Mesaros, and School Principal Thomas Cook, asserting six claims: (1) violation of the Free Speech Clause of the United States Constitution; (2) violation of the Free Communication Clause of the Pennsylvania Constitution; (3) violation of the Establishment Clause of the United States Constitution; (4) violation of the Establishment Clause of the Pennsylvania Constitution; (5) violation of the Equal Protection Clause of the United States Constitution; and

---

[5]Reilly testified *The Matzoh Ball Fairy* is about a "family [that] eats matzoh balls[,] and they float because the matzoh balls were light and fluffy."

11

(6) violation of the guarantee of equal rights and the prohibition on discrimination in the Pennsylvania Constitution.[6] Busch

---

[6]Regarding the state speech claims, the Pennsylvania Supreme Court has identified several factors to guide an analysis of whether differences exist between federal and state constitutional provisions. *Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002) (*citing Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991)). Plaintiff has not addressed any of these factors, and our own consideration of them does not indicate the Pennsylvania Constitution differs from the federal constitution in the area of school speech. To the contrary, Pennsylvania state courts have followed federal constitutional principles when considering the speech of teachers in Pennsylvania classrooms, *see Fink v. Bd. of Educ. of Warren County Sch. Dist.*, 442 A.2d 837, 839–40, 841–42 (Pa. Commw. Ct. 1982) (holding the school did not violate the teacher's constitutional rights by prohibiting the teacher from reading the Bible in class), and as a matter of state policy — relevant to the Pennsylvania constitutional analysis — the Pennsylvania legislature has expressed a preference that religious texts not be introduced to younger students. 24 Pa. Stat. Ann. § 15-1515 (West 2006). Accordingly, we believe the analysis of Busch's free speech claims under the United States Constitution is dispositive of her claims under the Free Communications Clause, Article I, § 7, of the Pennsylvania Constitution.

Busch's state establishment and equal protection claims are likewise disposed of by the relevant provisions of the federal

12

seeks a declaratory judgment, actual and nominal damages, and costs and fees.

Following cross motions for summary judgment, the District Court granted summary judgment in favor of the Defendants and against Busch on all claims. This appeal followed.[7]

_____

constitution. *Springfield Sch. Dist. v. Dep't of Educ.*, 397 A.2d 1154, 1170 (Pa. 1979) ("[T]he provisions of Article I, Section 3 of [the Pennsylvania] constitution do not exceed the limitations in the first amendment's establishment clause."); *Harrisburg Sch. Dist. v. Zogby*, 828 A.2d 1079, 1088 (Pa. 2003) ("[T]he meaning and purpose of the Equal Protection Clause of the United States Constitution and the state Constitution's prohibition against special laws are sufficiently similar to warrant like treatment, and . . . contentions concerning the two provisions may be reviewed simultaneously." (citations omitted)).

[7]The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's grant of summary judgment. Our review is plenary, and we apply the same standard as the District Court. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

13

II

A

The elementary school setting — and particularly the kindergarten classroom — is a unique forum for purposes of considering competing First Amendment and pedagogical interests. Unlike parks, streets, and other traditional public fora, elementary school classrooms are not places for unlimited debate on issues of public importance. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). Most of the time, school classrooms are reserved for teaching students in a structured environment. *Walz ex rel. Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 275–76 (3d Cir. 2003). Public schools may take on characteristics of public fora by "intentionally opening" facilities for "public discourse." *Hazelwood Sch. Dist.*, 484 U.S. at 267 (*quoting Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)); *id.* ("[S]chool facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general

---

genuine issue as to any material fact and that the [school district] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party:" in this case, the plaintiffs. *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 235 n.5 (3d Cir. 2008) (citation omitted).

14

public,' or by some segment of the public, such as student organizations." (*quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983), *and citing Perry Educ. Ass'n*, 460 U.S. at 46 n.7)); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 102, 106–07 (2001) (opening school facilities to community groups after school hours); *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524–26 (3d Cir. 2004) (opening school facilities to a "broad array of community groups"). But in classrooms, during school hours, when curricular activities are supervised by teachers, the nonpublic nature of the school is preserved. Speech occurring during these activities may be regulated under standards different from those that would apply in public fora.

In the elementary school classroom, "the appropriateness of student expression depends on several factors, including the type of speech, the age of the locutor and audience, the school's control over the activity in which the expression occurs, and whether the school solicits individual views from students during the activity." *Walz*, 342 F.3d at 278; *see also id.* at 275 ("In the elementary school setting, age and context are key."). As we have explained, "the age of the students bears an important inverse relationship to the degree and kind of control a school may exercise: as a general matter, the younger the students, the more control a school may exercise."[8] *Id.* at 276.

---

[8]"[A]ny analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an

15

"While secondary school students are mature enough and are likely to understand that a school does not endorse or support speech that it merely permits on a nondiscriminatory basis, kindergartners and first graders are different." *Id.* at 277 (internal quotation marks and citation omitted). For elementary school students, "the line between school-endorsed speech and merely allowable speech is blurred, not only for the young, impressionable students but also for their parents who trust the school to confine organized activities to legitimate and pedagogically-based goals." *Id.*

Restrictions on speech during a school's organized, curricular activities are within the school's legitimate area of control because they help create the structured environment in which the school imparts basic social, behavioral, and academic lessons. *Id.* at 275–76. The curricular standards applied during these activities, "especially those that occur in kindergarten and first grade, when children are most impressionable, should not be lightly overturned." *Id.* at 277; *see also Hazelwood Sch. Dist.*, 484 U.S. at 271 ("Educators are entitled to exercise greater control over [school-sponsored expressive activities] to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to

_____

environment conducive to learning on the other, must necessarily take into account the age and maturity of the student." *Walker-Serrano by Walker v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003).

16

material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.").

Some classroom discussion of religion or religious practices may be consistent with appropriate curricular standards, but classroom speech promoting religion or specific religious messages presents special problems for educators. *See Walz*, 342 F.3d at 280 ("[P]roselytizing speech . . . if permitted, would be at cross-purposes with [the school's] educational goal and could appear to bear the school's seal of approval."); *id.* at 278 ("For a student in 'show and tell' to pass around a Christmas ornament or a dreidel, and describe what the item means to him, may well be consistent with the activity's educational goals . . . . Nevertheless, in the context of an organized curricular activity, an elementary school may properly restrict student speech promoting a specific message."); *cf. Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary."). Consistent with its pedagogical goals, educators may appropriately restrict forms of expression in elementary school classrooms.

Whether a school invites or solicits speech from students helps determine whether student speech is consistent with the

17

school's pedagogical goals. But the fact the speech was invited during a curricular activity does not necessarily prevent the school from limiting the student's response. The school may properly require that the solicited speech respond to the subject matter at hand. *See C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 211 (3d Cir. 2000) (en banc) (Alito, J., dissenting) ("Public school teachers have the authority to specify the subjects that students may discuss in class and the subjects of assignments that students are asked to complete. Thus, if a student is asked to solve a problem in mathematics or to write an essay on a great American poet, the student clearly does not have a right to speak or write about the Bible instead." (citations omitted)). And the school may require classroom responses conform to the mode of presentation requested. *Walz*, 342 F.3d at 279. That is, when invitations for student expression are intended to elicit descriptive responses, the school may limit the responses accordingly.

Likewise, when parents participate in an elementary school's curricular activities, the school may impose the same requirement — that they refrain from promoting specific messages in class. The school's pedagogical considerations are present, and are perhaps heightened, when a parent is the speaker because parents, much like teachers, are typically held in high regard and viewed as authoritative by young children. By inviting participation in curricular activities, educators do not cede control over the message and content of the subject matter presented in the classroom. Were teachers or school

18

administrators required to do so, individual students or parents could use the classroom to promote any message in the guise of a pedagogically approved curricular activity.

Educators should be free to seek appropriate ways to involve parents in the education of their children. *See* Brief of Nat'l Sch. Bds. Ass'n and Pa. Sch. Bds. Ass'n as Amici Curiae Supporting Appellees at 4 (recognizing "the need to avoid creating legal disincentives for schools to do all they can to engage parents in their children's educations"). Yet the value and frequency of these efforts could be jeopardized if parents — once invited into the classroom to share details about their family experience as part of "show and tell" activities — could express any message of their choosing so long as it related in some way to their child. *See id.* (explaining that inability to exercise discretion would "force school districts to re-evaluate parent participation in school projects on the basis that they can ill afford the loss of control over the curriculum, legal complications, and potential liabilities"); *id.* at 10 ("*Amici* submit that activities which take place during instructional time in public schools must be subject to school control, and that the mere invitation to parents to help out with classroom activities or homework assignments cannot result in carte blanche to teach anything one pleases to a captive audience of public school students."). In the elementary school setting, and particularly at the kindergarten level, educators would face the dilemma of either foregoing valuable curricular activities or foregoing the ability to control the pedagogical direction of their classrooms.

19

B

In this case, Donna Busch sought to read aloud passages from the Bible to students in a kindergarten classroom, with the teacher present, as part of a curricular exercise. In this context, the school was concerned she would "promote a religious message through the channel of a benign classroom activity." *Walz*, 342 F.3d at 280.

Busch contends the nature of the "All About Me" exercise alters the context of the speech in two ways. First, she contends the activity's focus on Wesley during his "All About Me" week prevented any perception of school endorsement. "Show and tell" exercises — commonplace in elementary school curricula — are valuable pedagogical tools for furthering the behavioral and social development of children. But like other curricular activities in the kindergarten classroom, "show and tell" assignments generally presume the school may limit the content of the presentations. *Cf. id.* at 278 ("[I]n the context of an organized curricular activity, an elementary school may properly restrict student speech promoting a specific message."). Moreover, unlike in *Walz*, the speaker here was not a student. That it was a student's parent further blurs "the line between school-endorsed speech and merely allowable speech." *Id.* at 277.

Second, pointing to our statement in *Walz* that "[i]ndividual student expression that articulates a particular view but that comes in response to a class assignment or activity

20

would appear to be protected," *id*. at 279, Busch contends her speech should have been permitted because she intended to express a solicited view on the pertinent subject matter. That is, the school invited her to participate in Wesley's "All About Me" week, where "all about Wesley" was the subject matter, and she intended to present a viewpoint about Wesley. Accordingly, Busch contends that once she was invited to speak, any restriction on her speech was impermissible so long as her speech was about Wesley.[9]

The school need not choose, however, between soliciting information about students as part of curricular activities and opening the classroom to any content the speaker chooses to disseminate. In crafting a curriculum, school officials face the

---

[9]At her deposition, Busch testified that the school would not be able to restrict a parent in Wesley's class who, as part of his or her child's "All About Me" week, wished to read material advocating extreme violence and discrimination. We think it is fair to discount these statements, which were elicited by opposing counsel's pointed questioning. When presented with less provocative hypothetical scenarios at oral argument on this appeal, however, Busch's attorney similarly asserted that no line drawing by the school would have been permissible so long as a parent's message related to his or her child. The gist of Busch's testimony and counsel's argument is that Busch believes schools must choose between allowing all invited parent speech or allowing none at all.

sensitive task of exposing children to diverse traditions and cultural experiences while also remaining mindful of the expectations and rights of the children and their parents. Principal Cook disallowed a reading from holy scripture because he believed it proselytized a specific religious point of view. As in *Walz*, the school's reasons — to prevent promotion of a religious message in kindergarten — were "designed to prevent . . . speech that, if permitted, would be at cross-purposes with its educational goal and could appear to bear the school's seal of approval." *Id.* at 280.

Busch also contends the school's restriction of her speech was unrelated to the legitimate purpose of avoiding promotion of religious messages generally but was instead motivated by its desire to censor her and Wesley's particular religious beliefs. That is, the school was unconcerned with proselytizing generally and only concerned with her Christian messages. She bases her contention on a general assertion that the school had previously exhibited animosity toward her faith while tolerating the presentations of parents of other faiths in Wesley's classroom. Specifically, she points to the two presentations by Linda Lipski on Hanukkah and Passover. As noted, during Hanukkah, Lipski brought in a menorah and a dreidel and read "a Blue's Clues Hanukkah story." On the Passover holiday, Lipski read *The Matzoh Ball Fairy* to the students and then offered them matzoh

ball with chicken soup.[10]

But the unchallenged record demonstrates the school permitted Wesley, in the classroom and as part of his "All About Me" week, to express his religious beliefs. These beliefs were featured on his "All About Me" poster as a depiction of a church and a statement expressing that he likes to attend church. Wesley was permitted, as other students were, to present his poster to the class in the manner he desired. Accordingly, the school's actions do not appear to have been motivated by discrimination against Wesley's religion. Rather, the school identified a significant difference between the identification of religious belief and certain holiday-oriented religious materials, on the one hand, and a parent's reading of holy scripture, on the other hand, which it considered a form of proselytizing.

It may be reasonably argued that a mother's reading of the Bible to a kindergarten class, especially sublime verses from the Book of Psalms, should be permitted. In this sense and for many, the conduct is benign and the message inspiring. But a

---

[10]Busch also acknowledged that Wesley's teacher keeps a library of books she periodically reads to Wesley's class. Several of these books are about holidays, including *Bear Stays Up for Christmas*, *Froggy's Best Christmas*, *The Wild Christmas Reindeer*, *Ten Timid Ghosts on a Christmas Night*, *Christmas Trolls*, *The Best Easter Eggs Ever*, *Easter Bunny's On His Way*, *The Night Before Easter*, *Hooray for Hanukkah*, *The Magic Dreidels*, and *The Hanukkah Mice*.

reading from the Bible or other religious text is more than a message and unquestionably conveys a strong sense of spiritual and moral authority. In this case, the audience is involuntary and very young. Parents of public school kindergarten students may reasonably expect their children will not become captive audiences to an adult's reading of religious texts.

The dilemma here is that our jurisprudence seeks to affirm the right of individuals to identify and practice their religion and at the same time to forestall the establishment of religion. In this case, as in many others, these fundamental principles are in tension with one another. Often a vehicle of religious practice, speech is sometimes undertaken in private, sometimes in a group, and sometimes, as here, in a public school. The public school setting may implicate the Establishment Clause, especially where public authority undertakes or is reasonably perceived to have undertaken to give one religious belief official approval or approval over other religious beliefs. And this tension is particularly vexing in a public school where attendance is compulsory and moral and social values are being developed along with basic learning skills. In seeking to address that tension, elementary school administrators and teachers should be given latitude within a range of reasonableness related to preserving the school's educational goals. *See Hazelwood Sch. Dist.*, 484 U.S. at 273; *Walz*, 342 F.3d at 277–78, 280–81. In this case, the school's

24

actions were not unreasonable.[11]

III

Busch also challenges the school's actions on establishment grounds. Under *Lemon v. Kurtzman*, 403 U.S.

---

[11]Busch averred additional claims on equal protection grounds. She contends the school's disparate treatment of her and Lipski interfered with her and Wesley's fundamental right to free speech. Because we conclude the school's actions did not unconstitutionally burden Busch or Wesley's First Amendment rights, rational basis review is appropriate. *See Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right. However, since we hold . . . that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test."); *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1019 (9th Cir. 2002) ("[R]ational basis review is appropriate unless the restriction unconstitutionally burdens a fundamental right, here, the right to free speech. Because we conclude that the restrictions do not unconstitutionally burden Rubin's right of free speech, we find that neither do they violate his Equal Protection right."). Accordingly, because the school's action was in furtherance of a legitimate pedagogical objective, we affirm the District Court's holding that no equal protection violation occurred.

25

602 (1971), government conduct complies with the Establishment Clause if it meets three criteria. First, it must have a secular purpose. *Id.* at 612. Second, its primary or principal effect can neither advance nor inhibit religion, meaning that regardless of its purpose, the action cannot symbolically endorse or disapprove of religion. *See id.*; *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1485–86 (3d Cir. 1996) (en banc). Third, the government action cannot foster an excessive entanglement with religion. *Lemon*, 403 U.S. at 613; *ACLU*, 84 F.3d at 1483.

Regarding the first of these criteria, Principal Cook prohibited Busch's reading because he said it would be "against the law . . . of separation of church and state." Complying with the Establishment Clause jurisprudence is a secular purpose. And given the history of Establishment Clause violations when religious messages have been conveyed at school-sponsored activities, *see, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (football games); *Lee v. Weisman*, 505 U.S. 577 (1992) (graduation ceremony), Cook's determination that a biblical reading to kindergarten students during a curricular activity might also violate the Establishment Clause is not unreasonable.

The likelihood of an Establishment Clause violation is relevant to the second *Lemon* prong as well. An objective observer would recognize the challenges educators face when confronting potential Establishment Clause violations. *See, e.g.*, *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308 (focusing the

26

analysis on an objective observer familiar with the situation confronting the school). Principal Cook's efforts were reasonably oriented toward complying with the Constitution, and accordingly, an observer would not recognize his actions to be hostile toward Wesley and Busch's faith. An objective observer would also know of Wesley's own participation in the "All About Me" week. These events do not demonstrate hostility to Wesley's identification with his faith.

Finally, Busch suggests the school's policy governing religious content in the classroom requires educators to make ad hoc judgments, creating an excessive entanglement with religion: "Defendants do not have a coherent policy governing parental participation in classroom activities or religious expression. Instead, judgments about what is permissible and what is not permissible are made on an *ad hoc* basis, with Defendants scrutinizing the speech at issue and making an uninformed judgment call as to whether the speech is too religious. This creates excessive entanglement between government and religion." Br. of Appellant at 15. The school district, however, has a policy permitting holiday-oriented content and cultural themes but disallowing speech that promotes religion. The school's monitoring of materials presented in elementary classrooms for the purpose of complying with its policy and the Establishment Clause does not render the government's actions excessively entangled with religion. *See Bowen v. Kendrick*, 487 U.S. 589, 615–17 (1988) (finding the review of educational materials to ensure

27

compliance with statutory and constitutional requirements does not create an excessive entanglement with religion).

Accordingly, the school's actions do not violate the Establishment Clause because they were motivated by a permissible purpose to comply with the Establishment Clause; they do not evidence hostility toward Wesley's faith; and they are not excessively entangled with religion.

IV

For the foregoing reasons, we will affirm the judgment of the District Court.

BARRY, Circuit Judge, *concurring*.

We have observed that "at a certain point, a school child is so young that it might reasonably be presumed" that the First Amendment does not protect that child's speech. Walker-Serrano by Walker v. Leonard, 325 F.3d 412, 417 (3d Cir. 2003). We have also observed that "[w]here that point falls is subject to reasonable debate." Id.

It cannot seriously be a subject of reasonable debate that "that point" is kindergarten. I say this not because Wesley, then age five, could neither read nor write and not because I take issue with his mother's claim that the Bible is Wesley's favorite book and not because, at least in my view, Wesley and his

28

kindergarten classmates would have been unable to understand the excerpts from Psalm 118 that his mother sought to read on his behalf, excerpts which tell us what Israel and the House of Aaron say about the Lord's mercy and note the concept of salvation, a concept I note has been the subject of discussion and debate among biblical scholars for centuries. I say that "that point" is kindergarten because children of kindergarten age are simply too young and the responsibilities of their teachers too special to elevate to a constitutional dispute cognizable in federal court any disagreement over what a child can and cannot say and can and cannot do and what a classmate can and cannot be subjected to by that child or his or her champion.

We send our littlest ones off to school worrying about them and hoping no harm will come to them, but confident in the knowledge that they will be protected and guided and, yes, nurtured by their teachers, who are our surrogates while our children are away. And so I write because I find something unsettling about this case and others like it which, while recognizing the crucial importance of age in determining the extent of the First Amendment's protections, have not – at least, not yet – carved out an exception for the little ones but, rather, continue to scrutinize and analyze purported violations of the First Amendment rights of children at the pre-K and kindergarten levels. I nonetheless join Chief Judge Scirica's excellent Opinion because it correctly applies our precedent to the issues before us. Perhaps our next case will tweak that precedent just slightly to accommodate my concerns.

29

HARDIMAN, Circuit Judge, *dissenting in part and concurring in part.*

The Supreme Court has consistently considered two important questions in Free Speech Clause cases involving private speech: (1) whether the state's regulation of speech is based on subject matter or viewpoint; and (2) whether the speech being regulated takes place in a public forum, a limited public forum, or a nonpublic forum. The majority does not discuss the first question. As for the second question, the majority summarily concludes that this classroom was a nonpublic forum. After doing so, the majority relies extensively on *Walz v. Egg Harbor Township Board of Education*, 342 F.3d 271 (3d Cir. 2003), in concluding that the School District appropriately barred Donna Busch from speaking. Because I do not believe *Walz* controls this appeal, I must respectfully dissent from that portion of the majority's opinion that relates to Busch's free speech claim.[12]

I.

_____

[12] I concur with the majority's holding in Part III of its opinion denying Busch relief on her Establishment Clause claim. However, I disagree with the majority's implication in that Part that the School District's desire to avoid an Establishment Clause violation was a valid concern. *See infra* note 5.

Under the First Amendment, content-based regulations of speech are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). This presumption covers two types of content-based regulations: (1) prohibitions of public discussion of an entire topic or subject matter; and (2) restrictions on particular viewpoints. *See Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980). Accordingly, a content-neutral regulation "places no restrictions on . . . either a particular viewpoint or any subject matter that may be discussed." *Hill v. Colorado*, 530 U.S. 703, 723 (2000).

The distinction between subject-matter and viewpoint discrimination is not a bright one. *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003). As a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). Therefore, governmental action that regulates speech on the basis of its subject matter "slip[s] from the neutrality of time, place, and circumstance into a concern about content." *Id.* at 99. If the marketplace of ideas is to remain free and open, governments must not be allowed to choose "which issues are worth discussing or debating." *Consol. Edison*, 447 U.S. at 537-38; *Startzell v. City of Phila.*, 533 F.3d 183, 192-93 (3d Cir. 2008). "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 515

31

(1981).

By contrast, viewpoint discrimination occurs when the government targets not just subject matter, but also particular views taken by speakers on a subject. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is "an egregious form of content discrimination" and "the violation of the First Amendment is all the more blatant." *Id.* "To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint." *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004). As Justice Brennan explained in his dissent in *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), "[v]iewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" *Id.* at 62.

The Supreme Court has consistently held that discrimination based on the religious character of speech is properly classified as viewpoint discrimination. In *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), the Court held that a school district could not permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious perspective. *Id.* at 393. Similarly, in *Rosenberger*, the Court held unconstitutional a university's refusal to fund a student publication because it

32

addressed issues from a religious perspective. 515 U.S. at 831. The Court explained: "Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* Finally, in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), the Court found viewpoint discrimination where a public school permitted nonreligious groups to meet on school property after school but prohibited a Christian club from doing so. *Id.* at 107-09. The Court held that exclusion of a religious group amounted to impermissible viewpoint discrimination where the group sought only "to address a subject otherwise permitted under the [school district's policy], the teaching of morals and character, from a religious standpoint." *Id.* at 109. Together, *Lamb's Chapel*, *Rosenberger*, and *Good News Club* stand for the proposition that if the government permits the discussion of a topic from a secular perspective, "it may not shut out speech that discusses that same topic from a religious perspective." *Stafford*, 386 F.3d at 528.

Comparing the facts of *Walz* and the present case, I find they fall on opposite sides of the subject-matter/viewpoint divide. In *Walz*, this Court considered whether a school's refusal to allow a first-grade student to distribute pencils that included the phrase "Jesus [Loves] The Little Children" and candy canes with attached religious stories during a classroom holiday party violated the student's constitutional rights. 342 F.3d at 274. The school maintained an unwritten policy

33

forbidding religious, as well as political and commercial messages, but noted that religion may be acknowledged "if presented in an objective manner and as a traditional part of the culture and religious heritage of the particular holiday." *Id.* at 273. As the district court in *Walz* determined, the regulation at issue was viewpoint neutral, although it limited some religious speech. *Walz v. Egg Harbor Twp. Bd. of Educ.*, 187 F. Supp. 2d 232, 239-40 (D.N.J. 2002). Citing *Lamb's Chapel*, the student argued that because the restriction addressed religious speech specifically, it was not viewpoint neutral. The district court disagreed. The court acknowledged the Supreme Court's warning that discrimination against religion in general may constitute viewpoint discrimination because it prevents discussion from a religious standpoint. However, the court found *Lamb's Chapel* and its progeny inapplicable because the school had not opened a forum for the exchange of views about a subject by hosting a holiday party. *Id.* at 239. Rather, the school had only solicited generic gifts devoid of any message and had not created a forum to promote *any* viewpoint, religious *or* secular. *Id.* Therefore, the district court properly concluded that the regulation was viewpoint neutral, even if it discriminated on the basis of subject matter.

In contrast to the district court's careful analysis of the distinction between subject matter and viewpoint discrimination in *Walz*, this Court declined to engage in such an inquiry on appeal, concluding that "in the context of an organized curricular activity, an elementary school may properly restrict

34

student speech promoting a specific message." *Walz*, 342 F.3d at 278. Without determining whether the discrimination was based on subject matter or viewpoint, we held that the school could bar the student from "promot[ing] a religious message through the channel of a benign classroom activity." *Id.* at 280.

The regulation at issue in this appeal is different from that in *Walz*. As the District Court noted, this case involves viewpoint discrimination. *Busch v. Marple Newtown Sch. Dist.*, No. 05-CV-2094, 2007 WL 1589507, at *7 (E.D. Pa. May 31, 2007). The teacher's description of "All About Me" week left the subject matter of the assignment open-ended, stating: "Each child will have the opportunity to share information about themselves [sic] during their 'All About Me' week." Furthermore, the description encouraged discussion of the "child's family, hobbies, and interests," and invited parents to "come to school to share a talent, short game, small craft, or story" during their child's week. Accordingly, Donna Busch's attempt to read Psalm 118 to her son's class fell within the specified subject matter — *i.e.*, something of interest to her son and important to his family — and the sole reason for excluding her speech was its religious character. Psalm 118 does not contain vulgar or lewd language, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1985) ("The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech . . . would undermine the school's basic educational mission."), nor does it praise illegal activities, *Morse v. Frederick*, 127 S. Ct. 2618, 2629 (2007) (school was

35

justified in restricting speech that could be "reasonably viewed as promoting illegal drug use"), and there is no evidence that Busch's reading would have caused any sort of classroom disruption, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969).

Instead, the challenged speech was responsive to the assignment but approached it from a religious perspective because religion is most important to the Busch family. As the Supreme Court has observed, particularly in the context of religious expression, it can be difficult to discern what amounts to a subject matter unto itself, and what, by contrast, is best characterized as a standpoint from which a subject matter is approached. *See Rosenberger*, 515 U.S. at 831. However, I believe the school went too far in this case in limiting participation in "All About Me" week to nonreligious perspectives. As the District Court properly noted, Donna Busch was denied the opportunity to read the story her son chose because it expressed a *religious viewpoint*, rather than a secular one. This plainly constituted viewpoint, not subject matter, discrimination.[13] As then-Judge Alito recognized in his dissent

___

[13]As Busch argues, that this was viewpoint discrimination is made manifest by the fact that religious discussion had not been foreign to this classroom in the past. Apart from "All About Me" week activities, a different parent twice was invited to present to the class about Hanukkah and Passover. Therefore, in addition to having discriminated against the religious perspective *generally* – in contravention of *Lamb's Chapel*,

in *C.H. v. Oliva*, 226 F.3d 198 (3d Cir. 2000) (en banc), such viewpoint discrimination is proscribed by the First Amendment unless the School District can show that allowing Busch's speech on a nondiscriminatory basis would have "materially disrupt[ed] classwork or involve[d] substantial disorder or invasion of the rights of other [ ] [students]." *Id.* at 212 (quoting *Tinker*, 393 U.S. at 513). "When the government makes an avenue of communication available to the proponents of some views, the same opportunity must, absent exceptional circumstances, be afforded to others who wish to express their ideas in that manner, whether or not the governmental officials endorse or sanction the thoughts to be expressed." *Main Road v. Aytch*, 522 F.2d 1080, 1087 (3d Cir. 1975).

The viewpoint discrimination visited upon Busch differs from the treatment in *Walz*. Though we did not explicitly address the subject matter/viewpoint distinction in *Walz*, the district court's thorough analysis in that case shows that the regulation was viewpoint neutral; the school did not open the forum to discuss *any* subjects. By contrast, here the School District solicited speech, but then discriminated on the basis of viewpoint by refusing to allow Donna Busch to express herself from a religious perspective. Having opened the proverbial

*Rosenberger*, and *Good News* – the School District may have improperly discriminated *between* religious perspectives. Either way, the School District does not vigorously challenge the District Court's conclusion that its restriction of Busch's speech was viewpoint-based.

37

Pandora's box by inviting parents of kindergarten students to speak to the class about their children's "family, hobbies, and interests," the School District was required to respect the boundaries that it had set — however open-ended — provided that the speech remained germane to the subject matter and subject, of course, to the limitations set forth in *Tinker*, *Fraser*, and *Morse*. Because the basis of discrimination differs between the two cases, I do not find *Walz* controlling. [14]

[14]I also depart from the majority's brief forum analysis in Part II.A of its opinion. As the Supreme Court noted in *Perry*, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." 460 U.S. at 44. Accordingly, the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to the intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800 (1985).

The District Court found that the teacher's invitation converted the classroom into at most a limited public forum, which is created when the state opens a public place for expressive activity. *Perry*, 460 U.S. at 45. The District Court accurately noted that the School District "opened [the] classroom to specific people, the parents of [the] students, for a specific delineated purpose," to participate in the discussion of their children via "All About Me" week. *Busch*, 2007 WL 1589507, at *6. While the First Amendment "does not

38

II.

The majority's adherence to *Walz* is, in my view, also flawed because of that case's reliance on *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). In *Hazelwood*, the

---

guarantee access to property simply because it is owned or controlled by the government," *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981), when the state has opened a forum but limits the expressive activity to certain kinds of speakers or the discussion of certain subjects — as the School District did here — "[t]he Constitution forbids a state to enforce certain exclusions . . . even if it was not required to create the forum in the first place." *Perry*, 460 U.S. at 45. Although the School District surely was not required to invite parents into the classroom in the first place, once it did so, it could only apply reasonable time, place, and manner regulations; content-based prohibitions "must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46.

The majority summarily concludes that the classroom is a nonpublic forum. Even assuming this to be the case, the government could not restrict speech on the basis of the speaker's viewpoint. *Id.* at 45; *see also Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum *and are viewpoint neutral*.") (emphasis added); *Child Evangelism Fellowship*, 386 F.3d at 524 ("[E]ven if the . . . fora were not limited public fora but were closed, [the school] still could not engage in viewpoint discrimination.").

39

Supreme Court upheld a principal's deletion of student articles on teen pregnancy and divorce from a school-sponsored newspaper. The Court held that the school could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities as long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

*Hazelwood* is limited to situations in which the speech may be interpreted as coming from the school itself. As the Supreme Court acknowledged:

> The question whether the First Amendment requires a school to tolerate particular student speech . . . is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. . . . Educators are entitled to exercise greater control over this second form of student expression.

40

*Id.* at 271.

The Court reaffirmed this principle in *Rosenberger*, explaining:

> [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. . . . It does not follow, however . . . that viewpoint-based restrictions are proper when the University does not itself speak . . . but instead encourage[s] a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.

515 U.S. at 833-34. *See also Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1131-34 (2009) (noting distinction between government speech and private speech).

I find *Hazelwood* inapposite to this appeal because there is no risk that Busch's speech would "bear the imprimatur of the school," *Hazelwood*, 484 U.S. at 271, nor will it be mistaken for "the [school's] own speech." *Rosenberger*, 515 U.S. at 834.

41

Here, "All About Me" week was designed to help students "identify individual interests and learn about others." The teacher explained to parents that "[e]ach child will have the opportunity to share information about themselves [sic] during their 'All About Me' week." Students were invited to send in a poster with pictures of their favorite things, bring in special toys or snacks to share with the class, and parents were welcome to "come to school to share a talent, short game, small craft, or story." Everything from the title of the exercise – "All About *Me*" week – to the specific requests made by the teacher, indicated that the student (or, in reality, the parent) was speaking and not the school.[15] This is distinguishable from the situation in *Hazelwood*, which contained numerous indicia of school-sponsorship, including: the newspaper was produced by students in a journalism class that was part of the school curriculum; the school financed the paper and it was the official school newspaper; the students' work was reviewed and graded by a faculty member and the entire paper was subject to the review of the principal prior to publication. *See Hazelwood*, 484 U.S. at 268-69.

As *Walz* itself indicates, "[i]ndividual student expression that articulates a particular view but that comes in response to a class assignment would appear to be protected." 342 F.3d at 279. "[N]othing in *Hazelwood* suggests that its standard applies

[15] The likelihood that a kindergarten student would engage this assignment without parental influence and control is exceedingly remote. And the various approaches that a parent might take in this regard are as idiosyncratic as the number of parents.

when a student is called upon to express his or her *personal views* in class or in an assignment." *Oliva*, 226 F.3d at 213 (Alito, J., dissenting) (emphasis added). Donna Busch's speech came in response to the teacher's broad invitation to share something about her child; once invited, the School District was obliged to "tolerate" her speech, not to "affirmatively promote" it. *Hazelwood*, 484 U.S. at 271. "School- or government-sponsored speech occurs when a public school or other governmental entity aims 'to convey its own message.'" *Child Evangelism Fellowship*, 386 F.3d at 524 (quoting *Rosenberger*, 515 U.S. at 833). By contrast, when the school solicits the expression of "a diversity of views from private speakers," the expression that results is private. *Id.*

In *Walz*, this Court seemed concerned that young students would not be able to distinguish between school-sponsored speech and speech from private individuals, and "the school may wish to avoid the appearance of endorsing certain speech." 342 F.3d at 277. Accordingly, we set forth a number of factors against which to measure the propriety of student expression in an elementary school setting, including: the type of speech; the age of the speaker and audience; the school's control over the activity in which the expression occurs; and whether the school solicits individual views from students during the activity. *Id.* at 278.

The *Walz* factors strike me as highly manipulable and therefore may encompass speech — such as the expression at issue in this case — that will not be reasonably perceived as school-sponsored. Even kindergarten students are capable of

distinguishing between personal "show and tell" activities and school-sponsored instruction. As we observed in *Walz*:

> The appropriateness of student speech must be viewed in its educational context. For a student in "show and tell" to pass around a Christmas ornament or a dreidel, and describe what the item means to him, may well be consistent with the activity's educational goals; likewise, a lesson that includes a mock debate invites individual student expression on the relevant topic. In those scenarios, the student speaker is expressing *himself* in the context of a school assignment or activity *where the school has sought students' personal views.*

342 F.3d at 278 (emphasis added).

The speech at issue in this appeal closely resembles a "show and tell" exercise. Accordingly, Donna Busch's speech did not "bear the imprimatur of the school" and *Hazelwood* is inapposite.[16]

---

[16]Because I find that the speech in question could not have borne the imprimatur of the School District, I also reject the District Court's conclusion that the School District's viewpoint discrimination was necessary to avoid an Establishment Clause violation. "The Establishment Clause is not violated when the government treats religious speech and other speech equally and a reasonable observer would not view the government practice as endorsing religion." *Oliva*, 225 F.3d at 211 (Alito, J., dissenting) (citing *Capitol Square Review &*

44

III.

Finally, I note that even if we were to find that *Hazelwood* should control this case because any speech to young children is likely to be perceived as being school-sponsored, this would not conclude our inquiry. In holding that a school may regulate school-sponsored expressive activities so long as the regulation is "reasonably related to legitimate pedagogical concerns," the *Hazelwood* Court justified the principal's decision to discriminate on the basis of *content*; but that decision does not necessarily offer any justification for allowing educators to discriminate based on *viewpoint* absent a compelling government interest.

As the Supreme Court held in *Hazelwood*, "educators do not offend the First Amendment by exercising editorial control over the *style* and *content* of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273 (emphasis added). The school officials in that case conceded that any restrictions on school-sponsored student speech must be viewpoint neutral. *Id.* at 287 n.3 (Brennan, J., concurring). More fundamentally, if schools could impose viewpoint-based restrictions on all student speech that might be perceived as school-sponsored, the promise of *Tinker* — that students "do not

_____

*Advisory Bd. v. Pinette,* 515 U.S. 753, 763-70 (1995) (plurality)). Because the speech came from Busch and cannot be considered school-sponsored, it did not violate the Establishment Clause.

45

shed their constitutional rights to freedom of speech or expression at the schoolhouse gate" — would mean very little. *Tinker*, 393 U.S. at 506.

Because *Hazelwood* did not address the issue of viewpoint discrimination, the question of whether school-sponsored speech can discriminate on the basis of viewpoint remains open and our sister courts of appeals are split on this issue. Some circuits have found that *Hazelwood* requires that the school's regulation only be reasonably related to pedagogical concerns. *See Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918, 926-29 (10th Cir. 2002); *Ward v. Hickey*, 996 F.2d 448, 454 (1st Cir. 1993); *see also C.H. ex rel. Z.H. v. Oliva*, 195 F.3d 167, 172-73 (3d Cir. 1999), *vacated and reh'g en banc* ("*Hazelwood* clearly stands for the proposition that educators may impose *non-viewpoint neutral* restrictions on the content of student speech in school-sponsored expressive activities so long as those restrictions are reasonably related to legitimate pedagogical concerns.") (emphasis added). In essence, these courts read *Hazelwood* as establishing a rational basis standard for speech in the public school setting. The District Court embraced this standard, holding that "schools may restrict speech *even based on its viewpoint* 'so long as their actions are reasonably related to legitimate pedagogical concerns.'" *Busch*, 2007 WL 1589507, at *9 (emphasis added).

By contrast, other circuit courts of appeals have interpreted the *Hazelwood* standard to require that a school's restriction be not only reasonable, but also viewpoint neutral. *See Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626, 629-30 (2d Cir. 2005); *Planned Parenthood of S. Nevada, Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991);

*Searcey v. Harris*, 888 F.2d 1314, 1320 (11th Cir. 1989); *see also Oliva*, 226 F.3d at 211 (Alito, J., dissenting). Citing these cases, Busch argues that when a public school opens a limited public forum, the general rule prohibiting viewpoint-based restrictions remains effective despite *Hazelwood*.

Without explicitly embracing either of these two perspectives vis-à-vis viewpoint discrimination, we concluded in *Walz* that "in the context of its classroom holiday parties, the school's restrictions on this expression were designed to prevent proselytizing speech that, if permitted, would be at cross-purposes with its educational goal and could appear to bear the school's seal of approval." 342 F.3d at 280 (citing *Hazelwood*, 484 U.S. at 273). Given the school's valid educational purposes, this Court reasoned, its actions were appropriate. *Id.* The Court did not explain its level of scrutiny, however. Likewise, in the present case, the majority makes sparse mention of *Hazelwood* and does not attempt to justify the school's viewpoint discrimination under either rational basis review or strict scrutiny.[17]

If we wish to conclude that *Hazelwood* grants schools the power to discriminate on the basis of viewpoint, I think we should do so explicitly. This Court's approach in *Walz* and in this appeal, however pragmatic or commonsensical, lends itself

---

[17]Neither the *Walz* court nor the majority here would have had occasion to clarify whether *Hazelwood* disallowed viewpoint discrimination, because, as noted above, neither opinion addressed the question whether the discrimination was based on subject matter or viewpoint in the first place.

47

to ad hoc jurisprudence. I recommend that we establish clear rules regarding viewpoint discrimination in the classroom. "The need for specificity is especially important where, as here, the regulation at issue is a 'content-based regulation of speech. The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.'" *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (quoting *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997)); *see also Speiser v. Randall*, 357 U.S. 513, 526 (1958) ("When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone.'") (citation omitted).

IV.

Clearly, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Fraser*, 478 U.S. at 682. It does not follow, however, that the state may regulate one's viewpoint merely because speech occurs in a schoolhouse — especially when the facts of the case demonstrate that the speech is personal to the student and/or his parent rather than the school's speech. The majority's desire to protect young children from potentially influential speech in the classroom is understandable. But that goal, however admirable, does not allow the government to offer a student and his parents the opportunity to express something about themselves, except what is most

48

important to them.  With respect, I dissent.[18]

---

[18]  I agree largely with the sentiments Judge Barry expresses in her concurrence.  Like Justice Thomas's recent concurring opinion in *Morse*, Judge Barry harkens back to a day when American schools were run by principals and teachers, acting *in loco parentis*, with little or no intrusion from lawyers, courts, and parents.  *See Morse*, 127 S. Ct. at 2630-36 (Thomas, J., concurring).  But this is not where we find ourselves today.  As long as our schools continue to provide a forum for *some* parents and teachers to espouse their views in public schools, we must manage the speech of *all* parents and teachers within the guise of the First Amendment, lest we engage in the very sort of viewpoint discrimination that the Amendment was designed to protect against.

An "elementary school exception" or "kindergarten exception" to the First Amendment seems sensible to me. However, instead of establishing such an exception — which would delegate to schools the power to determine what is said and done in the classroom — the majority opinion merely allows *this* school to prohibit a viewpoint, germane to the assignment, that it disfavors.  In addition, I question whether the creation of such an exception should be the exclusive province of the Supreme Court.

49